STATE of Missouri, Respondent,

v.

James Edward RODDEN, Appellant.

No. 13960.

Missouri Court of Appeals,
Southern District,
Division Two.

June 25, 1986.

Lee M. Nation, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found James Edward Rodden ("defendant") guilty of the capital murder of Joseph Robert Arnold ("Arnold"), § 565.001, RSMo 1978,[1] and fixed punishment at imprisonment during defendant's natural life, without eligibility for probation or parole until he has served a minimum of 50 years of his sentence. § 565.-008.1, RSMo 1978.[2] The trial court entered judgment and sentence accordingly.

Defendant appeals, briefing three assignments of error, the first of which is that the evidence was insufficient to support the finding of guilty. In resolving that issue, we consider the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald,* 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi,* 636 S.W.2d 338, 340 (Mo. banc 1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia,*

---

1. Section 565.001, RSMo 1978, was repealed effective July 1, 1984, by §§ 1 and A, H.C.S.S.C.S. S.B. 276, Laws 1983, pp. 923, 931. The effective date of the repeal was changed to October 1, 1984, by § A, S.C.S.S.B. 448, Laws 1984, p. 757.

2. Section 565.008, RSMo 1978, was repealed in like manner as § 565.001, RSMo 1978, by the 1983 and 1984 legislation referred to in footnote 1.

443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

The cause was tried June 25–28, 1984. The Executive Director of the Marshall, Missouri, Housing Authority testified that about two years earlier, Arnold had leased from the Authority a two-bedroom residential unit in a duplex. Arnold's unit, referred to as an "apartment," was situated at 24 West College Circle.

Fran Jones testified she had known defendant "a year and a half to two years," and had been his "girlfriend." Ms. Jones explained that defendant had begun residing with Arnold in the latter's apartment in August or September, 1983, and that during the time she had dated defendant, she had stayed with him some nights in the apartment. According to Ms. Jones, the southeast bedroom was occupied by Arnold, and was equipped with a water bed. Defendant occupied the southwest bedroom.

Leland Roll, proprietor of a bar in Marshall, testified that on Monday evening, December 5, 1983, Terry Trunnel, a woman whom he knew, was at his establishment, and that defendant arrived there later that night. Roll remembered Ms. Trunnel making a phone call, aided by defendant. Roll saw Ms. Trunnel and defendant leave the bar, together, about 11:45 p.m.

Fran Jones testified she phoned Arnold's apartment that night, December 5, and spoke to defendant about a trip to California that he and Arnold were planning. During the conversation, Ms. Jones heard "[t]wo other people talking." Asked about their voices, Ms. Jones said they sounded "[l]ike a man and a woman."

Ms. Jones recounted that a half hour to 45 minutes after the phone conversation, she received a phone call from defendant. This time, defendant asked Ms. Jones "if he could come over." Ms. Jones said no, but defendant replied he was coming anyway. Near the end of the conversation, according to Ms. Jones, defendant said he was "getting tired" and that he "was going to fuck the shit out of Terry." That comment terminated the conversation.

Later, Ms. Jones received another call from defendant. This time, he renewed his request to come over, and Ms. Jones again replied no. Asked what defendant said in response, Ms. Jones testified: "He told me that he wanted me to remember—everything that he did to Terry, he was really doing it to me—that it was just her body." Defendant repeated that he was coming over.

After receiving this call, Ms. Jones telephoned the police.

At 12:35 a.m., December 6, 1983, Officer Robert W. King of the Marshall police department was dispatched to Ms. Jones' residence in response to her call. Arriving there, Officer King spoke with Ms. Jones, but found no one else there.

Some time after Officer King departed, Ms. Jones heard defendant "yelling" and "knocking hard" on her door. He was demanding to be allowed inside. Ms. Jones phoned the police again, then phoned a female friend, Jan Bask, who lived nearby.

As a result of Ms. Jones' call, Officer King was again dispatched to Ms. Jones' residence, this time at 1:39 a.m. Upon arrival, Officer King saw a red, two-door Ford Maverick, bearing no license plate, backing out of Ms. Jones' driveway. King positioned his vehicle behind the Maverick, preventing it from leaving.

King identified defendant as the operator of the Maverick, and testified that he warned defendant that Ms. Jones did not want him on her property. Asked about defendant's demeanor, King testified: "At the time that I talked to him, he was quite angry and he was mad. He was using profane language." King recalled defendant stating he had been drinking; however, in King's opinion, defendant was not intoxicated.

King then spoke with Ms. Jones, who declined to sign a complaint, and stated she just wanted defendant off her property. King then asked defendant where he was living. Defendant replied that he was

spending the night with a friend at 24 West College Circle.

King thereupon escorted defendant to that address, noting that there was a "white over blue Ford setting there." King knew that vehicle belonged to Arnold.

Before leaving 24 West College Circle, King ordered defendant not to return to Ms. Jones' residence. King also warned defendant that if he remained outside, he (King) would arrest defendant. At that point, defendant went inside.

Later, Ms. Jones received yet another phone call from defendant. This time, according to Ms. Jones, defendant said that he, she and Jan "wouldn't survive the night."

This prompted another call by Ms. Jones to the police, this one occurring shortly after 2:00 a.m. Officer King and two other officers went to Ms. Jones' residence. While King was conferring with Ms. Jones, the other officers searched the vicinity, but found no one. Officer King then drove by 24 West College Circle to see whether defendant was still there. Arriving about 2:30 a.m., King observed the red Maverick and Arnold's Ford parked in front, and noted that lights were on in the apartment.

Eddie Walker, residing at 21 West College Circle, "three houses down" from Arnold's apartment, was outside his home "a little after 6:00" on the morning of December 6. At that time, Walker saw defendant come out of Arnold's apartment, "staggering" toward Arnold's Ford. Defendant was carrying a "sack," which he put down beside Arnold's Ford. Defendant then opened the trunk, put something inside, got in the Ford, and departed. Walker did not report the incident to police, as he had previously seen defendant drive Arnold's vehicle.

Bert Chevalier, a construction contractor who had been hired by the Marshall Housing Authority to replace cabinets in the Authority's housing units, arrived with his crew at the West College Circle complex around 8:00 a.m., December 6, and began unloading cabinets. Chevalier was unable to gain entry to Arnold's apartment, so he contacted Bruce Garrett, a maintenance mechanic employed by the Authority. Garrett, at Chevalier's request, met Chevalier at Arnold's apartment about 8:30 a.m. Upon arriving, Garrett saw some blood on the sidewalk.

Garrett opened the apartment door, and saw blood on the floor. Garrett instructed Chevalier not to enter.

Smelling smoke, Garrett went into the kitchen and saw a box "smoldering" by the counter. Garrett "put a little water on it," then promptly called the Housing Authority on a "walkie talkie," informing the Authority of what he had discovered.

Garrett then looked down the hallway and saw more blood. Walking down the hallway, Garrett saw the body of a "girl." He returned to the living room and called the Authority's office again, reporting the presence of the body. Garrett then exited the apartment and remained outside until Officer Brad Deems of the Marshall police department arrived.

Officer Deems saw the blood on the sidewalk and, on entering Arnold's apartment, saw blood in the living room, hallway, kitchen, bedrooms, and bathroom. He found the body of a female in the southwest bedroom. Deems testified, "She was nude and had blood all over her body."

In the southeast bedroom, the one with the water bed, Deems found the nude body of a male. Deems explained: "He had numerous wounds on him that were very apparent. There was a tremendous amount of blood under him and all around in that bedroom."

Deems noticed that although the weather was cold, the apartment was "very hot." Upon examining the thermostat, he observed it was set on 90 or 95 degrees.

Deems secured the scene, awaiting other officers.

Meanwhile, about 8:15 a.m., Ferrel Lewis heard a noise outside his home at Purdin, Missouri, some 68 miles north of Marshall. Lewis looked outside and saw that a Ford automobile had "come off of Highway 5

and hit the porch and it dropped down on top of the car." Lewis went out, noting that the vehicle's motor was still running. Lewis observed defendant "passed out" in the vehicle, so Lewis opened the passenger door and reached for the ignition switch to turn off the motor. About that time, defendant "come to," and he and Lewis got the motor stopped.

After a few minutes, defendant got out and "staggered around the car." Lewis saw blood on one of defendant's hands, and asked what had happened. According to Lewis, defendant explained he "had a flat tire and the jack had fell on him."

Defendant was taken inside Lewis' home, where he sat in a chair and "passed out" again. An ambulance was called, and it arrived about 8:45 a.m.

Trooper Dwight Hartung of the Missouri State Highway Patrol, who had been dispatched to the Lewis home, arrived soon after the ambulance. Hartung radioed the Ford's license plate number to Troop B headquarters at Macon, and was advised a short time later that the Ford was registered to Arnold.

Hartung saw defendant on the ambulance stretcher and asked his identity. Defendant replied, "James Rodden."

After the ambulance departed with defendant, Trooper Hartung looked inside the Ford and found a wooden handled butcher knife "on the right side of center of the front seat—partially under a green bed sheet."

Hartung ordered a Teletype message sent to the Marshall police department, requesting that agency to attempt to contact Arnold to see if he knew where his Ford was. In reply, Hartung was advised that defendant was a suspect in a double homicide. Hartung, aware that defendant was being taken to Pershing Memorial Hospital in Brookfield for medical attention, telephoned the Brookfield police department, requesting that officers go to the hospital and remain with defendant until Hartung could get there. Hartung then arranged

for the Ford to be towed to Brookfield, 18 miles away, and "impounded."

While the events at Purdin had been unfolding, Wally George, sheriff of Saline County, and James Simmerman, Marshall's chief of police, had been called to Arnold's apartment, and had commenced an investigation.

Asked whether he smelled anything when he first entered the apartment, Simmerman replied, "The predominant smell was burnt material that had just been put out—like when you walk into a house after a fire has been extinguished and smell that mixture of water mixed with burnt material and the smoke."

Sheriff George noted that the body of the female, covered with blood, was lying on a "mattress-type bed." George observed stab wounds in the left shoulder area, and a cord tied to the left wrist and right ankle. There was blood on the floor. Asked about that blood, George replied, "It appeared to me it had been walked through." A knife, with blood on the blade, lay atop a chest of drawers.

Regarding the bedroom where the body of the male was found, Sheriff George testified: "The room was covered with blood—the bed—floor—walls—door ... the nude male—was laying between the bed and the north wall." George explained that the bed consisted of a wood frame supporting the water-filled mattress. Sheets on the bed were "blood saturated." Asked about wounds on the male corpse, George replied, "I noticed what appeared to be stab wounds to the back, a stab wound to the chin and it looked like—I observed wounds to the head—to the top of the head."

In the hallway between the two bedrooms, George saw "[a] lot of blood," which appeared to have "been walked around in."

In the kitchen, George observed a charred cardboard box. John H. Woodland, Marshall's assistant fire chief, was called to the apartment to examine that. His testimony is synopsized *infra*.

The condition of the bodies and the presence of blood in the various locations were documented by numerous photographs taken by George. Another of George's photographs showed defendant's Maverick parked in front of the apartment.°

Chief Simmerman, formerly a homicide detective with the St. Louis police department and chief legal investigator for the St. Louis Medical Examiner, had been involved in over 10,000 violent death investigations, during which he had developed expertise in interpreting blood patterns at crime scenes.

Detailing the scene in the southeast bedroom where the male corpse was found on the floor north of the water bed, Simmerman explained that the head of the bed abutted the east wall. The blood on the sheets on the bed was concentrated in five areas. One was near the head of the bed at the northeast corner. A second was near the head of the bed at the southeast corner. A third was a short distance from the head of the bed at the center line. A fourth was on the north side of the bed approximately midway between the head and the foot. The last was on the south side of the bed, approximately midway between the head and the foot. Obviously, someone with bleeding wounds had been on the bed.

Blood patterns on the wall north of the bed indicated to Simmerman that "a lot of activity" had occurred in that room. Photographs show the male corpse lying face-up, with the legs bent at the knees so that the calves and feet are beneath the thighs, hidden from view. Simmerman explained: "When the police first got there, they thought his—they didn't think he had any legs from the knees on down until they started taking a good look at him. ... He was on his knees and he was bent completely over backwards."

Blood patterns on the north wall, adjacent to the male body, indicated to Simmerman that the male was originally lying facedown and "somebody flipped him backwards." Simmerman explained: "He's got a very thick accumulation of clotted and coagulated blood on his face, which—he had been evidently laying forward—face forward in a pool of blood, and then somebody grabbed him and threw him over backwards." Simmerman concluded that after this had occurred, the male sustained no further injuries.

Blood patterns on the floor of the southeast bedroom indicated to Simmerman that someone had "drug" a heavy object, trailed by something else, on the floor into the hallway toward the southwest bedroom.

In the southwest bedroom, where the female corpse was found, Simmerman saw "some blood on the walls as if somebody had brushed up against the walls that had blood on their arms." The bed on which the body lay, faceup, consisted of an innerspring mattress resting on the floor, on top of which two mattresses were stacked, one above the other. There was no bedframe to which the cord tied to the corpse's left wrist and right ankle could have been fastened, nor were there any sheets on the bed. Although there were multiple stab wounds on the body, which would have bled profusely, there was no blood on the mattress beneath the body. Simmerman opined that if the female had been lying in that position alive, the mattress "would have been saturated like a sponge with blood."

Simmerman observed areas of discoloration on the torso "as if the skin was burnt."

An empty lamp oil bottle was found on the bathroom floor, about a foot from the hallway.

Blood spots on the living room, kitchen, and bathroom floors indicated that someone had walked in those rooms while dripping blood. There was, however, no evidence of violent activity in any of those rooms. Blood on the kitchen sink indicated that someone had attempted to wash off blood with a dishwashing hose.

Just inside the front door, blood patterns on the floor caused Simmerman to conclude that someone had stood there shuffling his feet. Drops of blood on the sidewalk out-

side the front door indicated to Simmerman that someone had walked out and stood there for some period of time.

Assistant Fire Chief Woodland arrived at Arnold's apartment about 10:35 a.m., and, upon entering, smelled the residual smoke from the fire, and also detected a "cinnamon scent." Woodland explained that a flammable liquid is one whose "flash point" is below 100 degrees fahrenheit. A liquid with a "flash point" above 100 degrees is classified as a combustible liquid. According to Woodland, if the environment around a combustible liquid becomes "real hot," the chances of the combustible liquid taking on the properties of a flammable liquid are enhanced.

Woodland discovered that a combustible liquid, cinnamon scented lamp oil, had been "splashed" on various objects in the apartment. Among them were a cardboard box in the kitchen, and several items in the living room, including a drawing table, the television, the stereo, a chair, a jacket, and a bar stool.

In the southwest bedroom where the female corpse was found, Woodland observed some "burnt material" on the floor. He also saw burns on the body. Woodland described the burns on the body as second degree burns from the left armpit across both breasts, second degree burns across the abdomen, and a third degree burn "about the size of a grapefruit" on the right hip. Directly beneath the hip burn, Woodland saw an area "burned into the mattress."

Woodland concluded that fire had been ignited at two points: the cardboard box in the kitchen and the bed where the female corpse lay. In Woodland's opinion, both fires were intentionally set.

The parents of Terry Trunnel, who had been searching for her, arrived at the apartment and identified the female corpse as Terry. The male corpse was identified as Arnold, though how this was accomplished is not disclosed in the record.

Terry Trunnel's clothing and shoes were found in the southeast bedroom. The clothing was undamaged. The water bed heater was off, but the bed was still warm.

The two corpses were removed from the apartment about noon by a mortician, and taken to a funeral home in Marshall.

While the investigation at Arnold's apartment was being conducted, defendant was receiving medical attention at the hospital in Brookfield, where he was being guarded by Officer David Fifer of the Brookfield police department.

Gloria Washam, a nurse at the hospital, removed defendant's clothing, looking for injuries he might have sustained when the Ford collided with the porch. Ms. Washam observed that defendant had blood on the bottoms of his socks, but no injuries to his feet. Ms. Washam, in Officer Fifer's presence, asked defendant how he had injured his hand. Defendant replied that he had been changing a tire and the jack had fallen, catching his hand.

Allen R. Dixon, a medical doctor who attended defendant at the hospital, testified that defendant had two lacerations on his right hand. One was where the little finger joins the palm, extending from that joint to the joint of the ring finger. The tendons controlling the little finger had been cut, and had to be surgically repaired to enable defendant to flex that finger. The other laceration stretched about two inches across the web of the thumb joint.

Dr. Dixon sutured both lacerations, which he described as "deep cuts." In Dr. Dixon's opinion, both lacerations would be consistent with the hand sliding over the blade of a butcher knife.

At the request of law enforcement authorities, Dr. Dixon obtained samples of defendant's head hair and pubic hair.

Officer Fifer seized defendant's socks, boots, and clothing.

Trooper Hartung, arriving at the hospital in Brookfield, noted that defendant had no marks on his face evidencing injury. Hartung obtained a sample of defendant's blood from a technician in the hospital laboratory.

Richard Freeman, a deputy sheriff of Linn County, replaced Officer Fifer as defendant's guard at the hospital. Freeman asked defendant for permission to search the impounded Ford. Defendant, according to Freeman, said: "All right. Go ahead and search it."

Freeman, accompanied by Trooper Hartung and other officers, went to a warehouse where the Ford was sequestered, and conducted the search. Items removed from the Ford included a "fleece-lined seatcover," a green bedsheet, an ice scraper, and blood scrapings from a metal tool box.

On the afternoon of December 6, Sheriff George went to the funeral home where the bodies were being held, and took hair scrapings from both corpses. Afterward, he transported the bodies to a morgue in Columbia, where autopsies were scheduled the next morning.

The autopsies, witnessed by Sheriff George, were performed by Dr. Jay Dix, a forensic pathologist with unquestioned credentials. During the autopsies, Dr. Dix obtained hair samples and blood samples from both bodies, turning the samples over to George.

Dr. Dix described the body of Ms. Trunnel as that of a "youngish woman in her twenties that was approximately 66 inches tall—or 5' 6" tall, and weighed approximately 125 pounds." He found 11 stab wounds. Two were in the upper left chest, one was in the back under the left arm, six were on the left arm, one was on the right ankle above the cord (which was still tied there), and one was on the outside of the "left knee area."

Other external injuries included the burned areas described *supra* by the assistant fire chief, a bruise on the right eyelid, a scrape on the right cheek, and some abrasions on the upper lip. According to Dr. Dix, the facial injuries were "blunt impact injuries due to non-cutting type of instrument." Dr. Dix found no injuries on Arnold's hands to indicate they had struck anything.

Internal examination of Ms. Trunnel's body revealed that two of the stab wounds had entered the left lung. One of those was the wound on the back, the other was one of the wounds on the left chest. Those were the fatal wounds.

Dr. Dix also discovered that Ms. Trunnel had received a blow to the back of the head, causing a bruise beneath the scalp, and that her left arm had been fractured.

Dr. Dix testified that had Ms. Trunnel been lying on the bed in the southwest bedroom when she was stabbed, and had she not been moved thereafter, he would have expected there to be blood "pooling down [her] side onto the bed."

Arnold, according to Dr. Dix, "was approximately 5' 7" tall and weighed approximately 160 pounds." He had sustained nine stab wounds. One was near the middle of the forehead, one was near the hairline on the left side of the head, two were on the left cheek, one was near the right chin and penetrated the right chest cavity, one was on the left upper chest, one was in the middle of the chest, and two were on the left side of the back. Additionally, Arnold had a "cutting wound" above the right ear.

Arnold's scalp was torn in the back of his head, which caused bleeding beneath the scalp. Hemorrhage over the brain suggested a slight injury there.

Both lungs had been penetrated by stab wounds. Dr. Dix attributed Arnold's death to "stab wounds to the chest and back area." Asked how many of Arnold's wounds were fatal, Dr. Dix replied, "Potentially fatal—maybe three—most likely two."

Dr. Dix found no "defensive stab wounds" on Arnold's forearms or hands. This indicated that Arnold had not used his arms "in a defensive manner."

A fingerprint analyst at the Missouri State Highway Patrol crime laboratory removed a latent fingerprint from the lamp oil bottle found in Arnold's apartment. The analyst compared that print with a known print of defendant's left thumb, and

concluded that the latent print and the known print were made by the same individual.

The chief forensic serologist at the Missouri State Highway Patrol crime laboratory performed a series of tests on the blood taken from the bodies of Ms. Trunnel and Arnold by Dr. Dix, and also on the specimen of defendant's blood obtained at the hospital in Brookfield by Trooper Hartung.

In addition to identifying defendant's blood as type O, the serologist was able to isolate the enzyme types and protein components of defendant's blood to a degree that established that only six persons in every 10,000 in the United States have blood with the same characteristics as defendant's.

Similar tests on Ms. Trunnel's blood revealed that it was type A, and that by reason of its enzyme factors and protein components, only 14 persons in every 10,000 in the United States have blood with the same characteristics as Ms. Trunnel's.

Tests of Arnold's blood established that it was also type A, but that it had different enzyme types and protein components than Ms. Trunnel's blood. From Arnold's enzyme and protein factors, the serologist determined that 39 persons in every 10,000 in the United States have blood with the same characteristics as Arnold's.

Blood with the same characteristics as defendant's was found by the serologist on the seatcover, sheet, ice scraper, and scrapings from the tool box removed from Arnold's Ford at Brookfield by deputy sheriff Freeman.

Blood with the same characteristics as defendant's was also found by the serologist on defendant's boots and trousers, seized by Officer Fifer at the hospital in Brookfield.

Additionally, blood with the same characteristics as defendant's was found by the serologist on numerous items seized by officers in Arnold's apartment, including: a towel from the kitchen sink, the dishwashing hose from the kitchen sink, a sock found in the bathroom doorway, a light switch cover from the bathroom, a light switch cover from the southeast bedroom where Arnold's body was found, bloodstains from cardboard boxes in the living room, a sheet of paper found on a coffee table in the living room, and bloodstains from the same table.

The lamp oil bottle, on which defendant's left thumb print had been discovered, also had blood with the same characteristics as defendant's.

Defendant's "T shirt," seized by Officer Fifer at the hospital in Brookfield, had blood with the same characteristics as defendant's, and also had blood with the same characteristics as Ms. Trunnel's.

On the *blade* of the knife found on the chest of drawers in the southwest bedroom where Ms. Trunnel's body was discovered, the serologist found blood with the same characteristics as Arnold's. At the time that knife had been found, a section of cord had been lying across it. The cord was the same type as the one tied to Ms. Trunnel's left wrist and right ankle.

Blood with the same characteristics as Arnold's appeared on a sock found in the southeast bedroom, where Arnold's body had been discovered.

On one of the socks seized from defendant by Officer Fifer, the serologist found blood with the same characteristics as defendant's, and also found blood that could have come either from Ms. Trunnel or Arnold, or from both of them. The same circumstances existed in regard to blood on a light switch cover from the bathroom of Arnold's apartment.

On the wooden handled butcher knife found by Trooper Hartung in Arnold's Ford, the serologist found blood that could have come from either Ms. Trunnel or Arnold, but not from defendant.

The serologist, also an expert in hair examination, testified that hairs found on Ms. Trunnel's left forearm, left wrist, and right ankle matched samples of defendant's head hair.

Defendant, the only defense witness, confirmed that he had met Ms. Trunnel by chance in the bar. According to defendant, Ms. Trunnel needed a ride home, and he agreed to take her. En route, said defendant, he asked if she "would like to smoke a joint" (marihuana). According to defendant, Ms. Trunnel said yes; consequently, they went to 24 West College Circle, where he introduced Ms. Trunnel to Arnold. After Arnold "rolled a joint" and poured some drinks, defendant phoned Fran Jones, whom defendant characterized as his "ex-girlfriend." Defendant admitted telling Ms. Jones that he was "going to have sex with Terry." According to defendant, this "was a jealousy tactic."

Defendant recounted that after the call, he left the apartment and drove to Ms. Jones' home, where he endeavored to persuade her to let him in. When his entreaties proved unavailing, he returned to his vehicle and started to leave, whereupon he was halted by a police officer. After the officer conferred with Ms. Jones, the officer ordered defendant to leave the premises, and followed defendant to 24 West College Circle.

Defendant testified that upon entering the apartment, he phoned Ms. Jones again, as he was "upset" because she had refused to talk to him. After that call, defendant said he went to his bedroom to see "who was home and who wasn't." Asked what he saw, defendant replied, "It just looked like two people making love."

Then, said defendant, he returned to the living room, smoked half a joint, then went to the bathroom. On leaving the bathroom, defendant testified he saw what appeared to be blood on the floor leading to his bedroom. Stepping into the doorway, defendant, so he said, encountered Arnold and asked what was happening.

At that point, according to defendant, "[Arnold] just kind of looked down and then he looked at me and he jumped up off the bed and started coming towards me." Defendant said he saw a knife in Arnold's hand, which prompted defendant to attempt to grasp Arnold's wrist. Defendant explained that his hand slid down the knife, and was cut. Then, according to defendant, a struggle ensued during which defendant was able to manipulate Arnold's hand, which held the knife, in such a way as to inflict cuts on Arnold. Ultimately, said defendant, he forced the knife into Arnold's chest "and he slumped down."

At this point, said defendant, he pulled the knife out of Arnold and backed away. Then, according to defendant, Arnold arose, lowered his head, and charged defendant. Defendant testified he (defendant) began swinging the knife "every which way," and he felt solid contact. At some point, explained defendant, "we was hand in wrist holding each other." Defendant testified that although he was much larger than Arnold, he (defendant) was unable to overpower Arnold.

Eventually, said defendant, Arnold fell to the floor on his face and stopped moving. Defendant testified he picked Arnold up, saw that he was dead, and "just laid him on over."

Then, said defendant, he went to his bedroom, saw Ms. Trunnel "kind of half off the bed," picked her up, and laid her across the bed. Defendant added that he held his hand on her chest, "but there was nothing."

After that, said defendant, he "walked around the apartment back and forth," about an hour, during which he was bleeding.

Defendant admitted spreading lamp fluid and starting a fire in the box in the kitchen and a fire in his bedroom. Asked why, defendant replied: "I just wanted to be rid of all—of every—all of it. I wanted it to be a bad dream—to make it go away." He explained the presence of his blood on the dishwashing hose by testifying that he changed his mind about the fire, and used the hose to spray water on the box.

Defendant said he then changed clothes and departed in Arnold's Ford, which, according to defendant, had a license plate and was in better condition than his car.

Furthermore, said defendant, he could not find his car keys.

Defendant testified that upon reaching Purdin, he "blacked out," as a result of which the Ford collided with the porch. Defendant admitted that his statement about his hand being injured by a jack was a lie.

Where the State, as it must in this case, relies on circumstantial evidence to sustain the guilty verdict, the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence. *State v. Goddard,* 649 S.W.2d 882, 884[2] (Mo. banc 1983), *cert. denied,* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983). However, the circumstances need not be absolutely conclusive of guilt, nor must they demonstrate impossibility of innocence—the mere existence of other possible hypotheses is not enough to remove the case from the jury. *Id.*

Defendant insists that his testimony supplied a reasonable explanation for the physical evidence against him, and that the incriminating evidence was not inconsistent with "this reasonable theory of innocence." Defendant asserts that all the State proved was that he was present at the crime scene, and later departed.

We disagree.

First, the jury could have reasonably found that Ms. Trunnel was not killed in defendant's bedroom, but was instead killed in Arnold's bedroom. Her clothing was found in Arnold's bedroom, indicating she had disrobed there, either voluntarily or under duress. As the clothing was undamaged, it is inferable that no physical violence accompanied its removal. Additionally, there was no blood beneath Ms. Trunnel's body where it lay on defendant's bed. Her wounds were such that the pathologist would have expected blood to have pooled on the bed beneath the wounds had they been inflicted there. Furthermore, the blood pattern on the floor in Arnold's bedroom rebuts any hypothesis

that Arnold moved Ms. Trunnel's body to defendant's bedroom. A pool of blood near Arnold's knees, in which his head had evidently been lying facedown before his body was thrown over backwards, is clearly scored with smear lines indicating that a heavy object, trailed by something else, was dragged past Arnold's body into the hallway leading to defendant's bedroom. The jury could have reasonably found that the heavy object was Ms. Trunnel's body, and that the trailing object was the cord tied to her left wrist and right ankle. Defendant's testimony that all he did regarding Ms. Trunnel's body was to change its position on his bed and place his hand on her chest to check for signs of life is rebutted by the presence of his head hair on her left forearm, left wrist, and right ankle, and by the presence of her blood on his T-shirt. Finally, the cord tied to Ms. Trunnel's left wrist and right ankle indicates that at some point, someone intended to tie her to something. Defendant's bed, consisting solely of three stacked mattresses, afforded nothing to which the cord could have been fastened. Arnold's water bed, however, had a wood frame to which the cord could have been tied. Arnold's bed was still warm at the time the crime scene was investigated.

Second, defendant's account of Arnold's death is rebutted by the blood patterns near Arnold's body. Defendant testified that after Arnold fell the final time, he (defendant) picked Arnold up, saw that he was dead, and "just laid him on over." Chief Simmerman, however, explained that the coagulated blood on Arnold's face revealed that he had lain facedown in a pool of blood for some time, and that blood patterns on the wall adjacent to Arnold's body demonstrated that it had been thrown over backwards with considerable force. It is inferable from this that defendant did not move Arnold's body until he decided to drag Ms. Trunnel's body into the southwest bedroom, and found it necessary to throw Arnold's body out of the way.

Third, defendant's account of the attack on him by Arnold is contrary to the physi-

cal evidence. The only wound of consequence sustained by defendant was on his right hand, which was cut in two places. The physician who treated that injury testified that it was consistent with the hand sliding over the blade of a butcher knife while using the knife to inflict stab wounds. Additionally, the pathologist found no "defensive stab wounds" on Arnold's forearms or hands, which one could have reasonably expected Arnold to incur during the second phase of the fight when, according to defendant, he was swinging the knife at Arnold "every which way."

Fourth, it was *Arnold's* blood, not Ms. Trunnel's, that was found on the blade of the knife lying on the chest of drawers in defendant's bedroom. If, as defendant contends, Arnold killed Ms. Trunnel in defendant's bedroom before attacking defendant, there is no explanation in defendant's testimony for the presence of Arnold's blood on *that* knife.

Fifth, defendant, by his own admission, attempted to destroy the crime scene by fire. True, he testified he wanted it to be a "bad dream" that would "go away." The jury, however, was not required to believe that explanation. *State v. Holt*, 592 S.W.2d 759, 774[24] (Mo. banc 1980).

■ Sixth, defendant fled the crime scene and sought no medical attention for his hand injury, which obviously continued to bleed during his journey. Defendant took with him the butcher knife bearing the blood of one, and perhaps both, of the victims. Defendant's flight ended only when he lost consciousness and crashed into Ferrel Lewis' porch at Purdin. Defendant's flight was admissible to show a consciousness of guilt on his part. *State v. Kilgore*, 447 S.W.2d 544, 547[4] (Mo.1969); *State v. Logan*, 617 S.W.2d 433, 435[3] (Mo.App.1981).

■ Seventh, defendant told Ferrel Lewis, and later Gloria Washam, that he had injured his hand changing a tire. This, of course, was untrue. Exculpatory statements, when proven false, evidence a consciousness of guilt and so bear directly on the issue of guilt or innocence. *State v. Zerban*, 412 S.W.2d 397, 399–400[2] (Mo. 1967); *State v. Ross*, 606 S.W.2d 416, 425[11] (Mo.App.1980).

■ The factors listed above supplied the jury ample grounds to disbelieve defendant's testimony that Arnold killed Ms. Trunnel,[3] and that he (defendant) killed Arnold in self-defense. We find that the State's evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the verdict are consistent with the hypothesis of defendant's guilt and repugnant to any reasonable theory of his innocence. Defendant's first point is, accordingly, denied.

Defendant's second point is:

"The trial court erred in overruling [defendant's] objections to certain statements made by [defendant] to Fran Jones prior to the alleged murder of Joe Robert Arnold in so far [sic] as said evidence was irrelevant, immaterial, and highly prejudicial."

■ The point does not identify the statements about which defendant complains, but by seining the argument portion of his brief—a task we are not obliged to undertake, *State v. Davis*, 586 S.W.2d 748, 750[4] (Mo.App.1979)—we deduce that the point refers to (a) defendant's statement that he was going to have sexual intercourse with Ms. Trunnel, (b) defendant's statement that everything he did to Ms. Trunnel, he was really doing to Ms. Jones, that it was just Ms. Trunnel's body, and (c) that defendant, Ms. Jones, and Jan Bask would not survive the night.

Defendant insists that the first two statements showed only that he wanted to have sex with another woman, or that he wanted to make Ms. Jones jealous. Defendant concedes he can find no case in point, but he argues that the testimony did

---

**3.** Although irrelevant to this appeal, we are informed by the State's brief that defendant, in a later trial for the capital murder of Ms. Trunnel, was convicted and sentenced to death, and that an appeal from that judgment is pending in the Supreme Court of Missouri.

not tend to prove any fact in issue, and was consequently inadmissible.

We hold otherwise.

■ First of all, the first two statements placed Ms. Trunnel in the apartment at a time when defendant was there, establishing that she did not arrive only after defendant departed in Arnold's Ford around 6:00 a.m., December 6. As it is inferable that Ms. Trunnel and Arnold were killed by the same person, Ms. Trunnel's presence in the apartment while defendant was there is a circumstance relevant to the State's theory that defendant was the person who killed Arnold. While defendant, in his testimony, admitted taking Arnold's life, one must be mindful that at the time Fran Jones testified about defendant's statements, defendant had not yet appeared on the witness stand, and the State had no confession by defendant that he had killed Arnold. These factors, alone, render the first two statements admissible.

■ Secondly, the State had the burden of proving deliberation and premeditation. Defendant's statements regarding Ms. Trunnel could reasonably be viewed as indicating jealousy, rage, and a predetermination to inflict pain, injury, or even death on her. Given the State's theory that Arnold and Ms. Trunnel met death at the hands of the same culprit, we cannot declare the statements regarding Ms. Trunnel irrelevant in this prosecution for the murder of Arnold.

As to defendant's statement to Ms. Jones that she, he, and Jan Bask would not survive the night, the State argues that it must be considered in conjunction with defendant's statement that everything he did to Terry, he was really doing to Ms. Jones, that it was just Terry's body. The State says that the two statements, together, demonstrate defendant's intent to "strike out" destructively at people because of his anger toward Ms. Jones.

■ Whether that logic is sound need not be determined. In matters of admission of evidence, we review for prejudice, not mere error. *State v. Tyler*, 676 S.W.2d 922, 924–25[5] (Mo.App.1984). Given the other evidence of defendant's anger toward Ms. Jones, supplied by the testimony of Ms. Jones and Officer King, the challenged statement is, at most, cumulative, and we fail to see how its receipt in evidence could have been prejudicial.

Defendant's second point is denied.

Defendant's final point maintains that the trial court erred in granting the State's challenges for cause against those members of the venire who professed "inability to return a death sentence." The point concedes, at least tacitly, that the only veniremen excused on that basis were those who stated they could not under any circumstances vote for the imposition of the death penalty.

Defendant argues that the exclusion of those members of the venire violated his right to trial by jury under U.S. Const. amends. VI and XIV, by denying him a jury composed of "a reasonably representative cross section of society." Additionally, defendant contends that this "death qualification" jury was "conviction prone and thus biased against him."

■ After briefing was completed in this appeal, the Supreme Court of the United States, on May 5, 1986, decided *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137, upholding an Arkansas murder conviction in which, over the accused's objection, all prospective jurors who stated that they could not under any circumstances vote for the imposition of the death penalty were excluded for cause. The arguments defendant asserts before us were made in *Lockhart* and rejected. The Supreme Court of Missouri has likewise rejected the same arguments. *State v. Mathenia*, 702 S.W.2d 840, 844[5] (Mo. banc 1986); *State v. Nave*, 694 S.W.2d 729, 735–36[6] (Mo. banc 1985).

*Lockhart, Mathenia,* and *Nave* are dispositive of defendant's final point.

Judgment affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.