United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 97-2100WM

_____

| | | |
|---|---|---|
| James E. Rodden, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Paul Delo; William Webster, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 11, 1998
Filed: May 4, 1998

_____

Before McMILLIAN, FAGG, Circuit Judges, and BOWMAN,[*] Chief Judge.

_____

FAGG, Circuit Judge.

James E. Rodden appeals the district court's denial of his habeas petition attacking his conviction and sentence for the capital murder of Terry Trunnel. See 28 U.S.C. § 2254. We affirm.

Around 11:00 p.m. one night in December 1983, Rodden offered acquaintance Terry Trunnel a ride home from a bar. On the way, they stopped by Rodden's

_____

[*]The Honorable Pasco M. Bowman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 18, 1998.

apartment to smoke some marijuana. Rodden's roommate, Joseph Arnold, was there. Rodden's former girlfriend called about purchasing some furniture from Rodden, who was moving to California with Arnold the next day. When Rodden demanded to see her, she refused, but Rodden went to her apartment anyway. She would not answer her door and called the police. When Rodden returned to his apartment at 2:00 a.m., he saw Arnold and Trunnel "making love." According to Rodden, they were in Rodden's bed. Rodden claims that although he heard no disturbance, he later saw blood on the floor, questioned Arnold, and Arnold came at him with a bloody knife. Rodden says a struggle ensued, and Rodden stabbed Arnold in self-defense. As Rodden tells it, Arnold had already stabbed Trunnel in Rodden's bedroom. After killing Arnold, Rodden spread lamp oil around the apartment and on Trunnel's body and set the apartment on fire, to "make it all go away." Taking a bloody knife with him, Rodden fled north in Arnold's car around 6:00 a.m. He was bleeding from deep cuts in his right hand, which could have resulted from his hand slipping forward onto a knife blade as he stabbed someone. Rodden later passed out from blood loss and crashed Arnold's car into a house.

A maintenance man who entered the apartment around 8:00 a.m to install new cabinets discovered the bloody bodies of Arnold and Trunnel and a smoldering fire. Arnold had been stabbed eight times in the face, head, chest, and back. He lay in a pool of his own blood on the floor of his bedroom. Trunnel had been stabbed eleven times in the chest, back, arm, and leg. Her faced was bruised and her arm was broken. Cords were tied around her left wrist and right ankle. Her body was blistered and charred in spots from being burned. Contrary to Rodden's story, blood evidence showed she had been killed in Arnold's bedroom and then dragged into Rodden's bedroom. Her blood was on the knife Rodden carried in fleeing the scene.

Missouri brought separate charges against Rodden for the capital murders of Trunnel and Arnold. See Mo. Rev. Stat. § 565.001 (1978) (repealed 1984). The State first prosecuted Rodden for Arnold's murder. A jury convicted Rodden, and he was

sentenced to life imprisonment without the possibility of parole for fifty years.  See State v. Rodden, 713 S.W.2d 279 (Mo. Ct. App. 1986).  Defended by the same attorney, Rodden was later tried for and convicted of murdering Trunnel.  This time, Rodden received the death penalty.  The Missouri Supreme Court affirmed Rodden's conviction and sentence for murdering Trunnel, see State v. Rodden, 728 S.W.2d 212 (Mo. 1987), and affirmed the denial of postconviction relief, see Rodden v. State, 795 S.W.2d 393 (Mo. 1990).   The United States Supreme Court denied certiorari.  See Rodden v. Missouri, 499 U.S. 970 (1991).  Rodden then filed this federal petition for a writ of habeas corpus, and the district court denied Rodden's petition.

In his appeal, Rodden first contends his death sentence for killing Trunnel violates double jeopardy because after hearing "substantially the same evidence," the jury in the Arnold murder trial sentenced Rodden to life imprisonment.  Rodden asserts collateral estoppel prevents Missouri from relitigating the issue of capital punishment for the same set of murders that an earlier sentencing jury considered.   Rodden relies on Bullington v. Missouri, 451 U.S. 430, 446 (1981) (double jeopardy prevents second sentencing hearing after retrial for same murder), and Ashe v. Swenson, 397 U.S. 436, 446 (1970) (based on collateral estoppel theory, double jeopardy precludes trial for robbing second victim of single robbery incident after acquittal for robbing another victim of same incident).  Rodden's reliance is misplaced.

The Double Jeopardy Clause protects against multiple punishments for the same offense, see Jones v. Thomas, 491 U.S. 376, 381 (1989), but does not prevent a state from selecting independent penalties for separate crimes, see Kokoraleis v. Gilmore, 131 F.3d 692, 695 (7th Cir. 1997).  "Each additional crime creates a fresh exposure to punishment, which may be cumulative--indeed, must be cumulative if there is to be deterrence for extra offenses."  Id.  Thus, a serial killer may be sentenced to death for killing someone after being sentenced to life imprisonment for killing someone else in a separate incident.  See id.  Similarly, a killer who murders two people at the same time may be tried separately for the two distinct murders and sentenced separately for

each murder.  See Therrien v. Vose, 782 F.2d 1, 5 (1st Cir. 1986); Miller v. Turner, 658 F.2d 348, 350-51 (5th Cir. 1981); see also Ciucci v. Illinois, 356 U.S. 571 (1958) (per curiam) (when a killer murders several people in the same incident, a state may separately prosecute the killer for the murder of each victim).  We conclude Rodden was not put in jeopardy twice for the same offense.  The jury in the first trial selected the punishment for Rodden's murder of Arnold, and the jury in the second trial selected the punishment for Rodden's murder of Trunnel.  The murders were two distinct offenses that carried separate penalties under Missouri law.

Rodden contends his attorney ineffectively represented him on direct appeal because the attorney failed to raise plain error challenges to the constitutionality of the prosecutor's statements during voir dire and closing argument in the penalty phase.  To succeed on an ineffective assistance claim, Rodden must show his attorney's performance was deficient and the deficiency prejudiced him.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  Rodden must show no reasonable, professional attorney could have omitted the plain error claims from appellate review, see Six v. Delo, 94 F.3d 469, 476 (8th Cir. 1996), cert. denied, 117 S. Ct. 2418 (1997), and there is a reasonable probability the result on appeal would have been different if the attorney had raised the plain error claims, see Reese v. Delo, 94 F.3d 1177, 1185 (8th Cir. 1996), cert. denied, 117 S. Ct. 2421 (1997).  Counsel's failure to attack the prosecutor's comments as plain error on appeal was not ineffective assistance of counsel because, as discussed below, Rodden's constitutional challenges to the comments fail on the merits.  See Six, 94 F.3d at 477.

Rodden asserts his appellate attorney should have raised a claim that the prosecutor inaccurately described the sentencing procedure and impermissibly minimized the jury's sense of responsibility for imposing the death sentence in violation of the Eighth Amendment.  See Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (holding Eighth Amendment prohibits imposition of death sentence by a sentencer that has been misled to believe the responsibility for deciding the appropriateness of the

-4-

death sentence rests elsewhere).   In support of his assertion, Rodden points to some of the prosecutor's remarks during the death qualification stage of voir dire and the prosecutor's closing argument during the penalty phase.

Although Caldwell was decided before Rodden's conviction became final on appeal, the State contends application of Caldwell, which involved remarks during the penalty phase, to remarks during voir dire is a new rule that should not be applied retroactively on collateral review.  See Teague v. Lane, 489 U.S. 288, 310 (1989). Because the State did not raise the Teague issue in the district court, we need not consider it.  See Bannister v. Delo, 100 F.3d 610, 622-23 (8th Cir. 1996), cert. denied, 117 S. Ct. 2526 (1997).  Nevertheless, we reject the State's assertion that application of Caldwell to voir dire remarks is a new rule for Teague purposes.  In evaluating a Caldwell claim, courts consider the entire trial scene, including jury selection, the guilt phase, the penalty phase, and the sentencing hearing, examining both the court's instructions and the attorneys' remarks.  See Davis v. Singletary, 119 F.3d 1471, 1482-85 (11th Cir. 1997), petition for cert. filed, No. 97-8452 (U.S. Jan. 27, 1998); Sawyer v. Butler, 881 F.2d 1273, 1286 (5th Cir. 1989) (en banc); Harich v. Dugger, 844 F.2d 1464, 1474, 1476 (11th Cir. 1988); see also Roberts v. Bowersox, No. 96-3789, 1998 WL 86559, at *2-3 (8th Cir. Mar. 3, 1998); Driscoll v. Delo, 71 F.3d 701, 711 n.8 (8th Cir. 1995), cert. denied, 117 S. Ct. 273 (1996).  Although remarks during the guilt phase of the trial are less likely to have an effect on sentencing than remarks during the penalty phase, see Darden v. Wainwright, 477 U.S. 168, 183 n.15 (1986), it is possible that comments about sentencing during voir dire could mislead the jury into believing the responsibility for imposing a death sentence rested elsewhere.  We thus turn to the prosecutor's remarks in this case.

During voir dire, the prosecutor asked potential jurors whether they understood that they only recommended a sentence to the judge.  If the jury recommended death, the judge could impose a sentence of either life imprisonment or death, but if the jury recommended a life sentence, the judge could not impose a death sentence.  The

prosecutor also said the judge has veto power over a jury's death recommendation and is in effect a thirteenth juror. During closing argument in the penalty phase, the prosecutor said a jury recommendation of the death penalty would send a message, whether or not the judge actually sentenced Rodden to death.

The prosecutor's remarks did not misstate Missouri law or mislead the jury about the significance of its role. See Roberts, 1998 WL 86559, at *3. Unlike the jury in Driscoll, 71 F.3d at 711, Rodden's jury was not told its decision didn't matter. See Roberts, 1998 WL 86559, at *3. We are satisfied the jury understood the seriousness of its sentencing role. In his penalty-phase closing argument, defense counsel referred to the prosecutor's argument that the jury merely recommended a sentence to the judge, then eloquently argued that each of the jurors would be responsible for Rodden's death and that it was their decision, not "a decision of the judge or a decision of the Missouri Supreme Court or . . . anybody else." The court reinforced this point when it instructed the jury, "It is your duty and yours alone to decide upon the punishment," "whether [a death sentence] is to be your final decision rests with you," the lawyers' arguments are not evidence, and "under the law it is your primary duty to fix punishment." We thus conclude Rodden's Caldwell claim is unavailing.

Rodden also contends his appellate attorney should have claimed the State's penalty-phase closing argument violated his right to due process. See id. Improper argument violates due process when the argument is so egregious that it renders the entire trial fundamentally unfair. See Darden, 477 U.S. at 181. To decide whether improper argument violates due process, we consider the type of prejudice that arose from the argument, what defense counsel did to minimize the prejudice, whether the jury received proper instructions, and whether there is a reasonable probability of a different sentencing decision absent the improper argument. See Miller v. Lockhart, 65 F.3d 676, 683 (8th Cir. 1995).

Rodden challenges the prosecutor's penalty-phase argument that the jury should recommend a death sentence so Rodden would not get Trunnel's murder "free," and that the jury merely recommends a sentence to the judge, who is ultimately responsible for sentencing Rodden to death. Rodden also complains of references to the Bible, war, Harry Truman, quickness of death in the gas chamber, and the unlikelihood that Rodden would actually be executed. Specifically, the prosecutor argued:

The judgment and sentence of the court and the jury in [the trial for killing Arnold] was for life in prison without probation or parole for fifty years. . . . Now, if James Rodden killed two people and he got fifty years in prison without parole for killing one person, does he get the murder of the second person free? Another fifty years without parole means nothing. . . . Now, defense attorneys say, they'll say, "Well, if you recommend that he die he may wind up in the gas chamber and he may languish there for as long as twenty or thirty minutes." Ladies and gentlemen, that's glitter. The ultimate decision on whether or not James Rodden will have to face his responsibility is in the hands of the judge. If you return a verdict recommending a death sentence, and it is important that at least at some point in his life or some fraction, if he never has to be executed in his life, years away, if he never does have to face it, the fact that he had to live under it for even between now and thirty days from now when he's sentenced, he deserves that if he's never executed, if he's never executed he deserves to sit down there with those people on death row. . . . Now, if [Rodden] gets fifty years in prison with no probation and parole for killing Joe Bob Arnold, my question to you is should he get the second one free? Should he not be punished for the murder of Terry Trunnel? For to return a verdict strapping the judge to, forcing him to consider only fifty years without parole, is no punishment whatsoever. . . . If a sentence, or at least a recommendation from this jury, saves one innocent life . . . a recommendation of the death penalty by you, whether the judge actually sentences him to death or not, sends a message. . . . I had a friend, a very good friend, who died in Viet Nam so that you . . . could be free from fear and violence. And I know some of you may have had friends who died in other wars. And if they died honorably so you could be free from fear, why is it so wrong that somebody like this should die dishonorably for the

same reason? . . . [Y]ou've heard of the Bible story of the Good Samaritan. We all know it. The Good Samaritan is a story of a man who's brutally mugged and murdered and left on the side of the road to die. And along come a number of people who help this man . . . . But what the story doesn't tell you about is what kind of person mugged and raped and left that person on the side of the road to die. James Rodden is that type of person. . . . Now, in closing, ladies and gentlemen, . . . this is not an easy decision. But, I ask you, when you go back and you weigh, if he got fifty years for killing one person, if we give him fifty years for killing another one and don't let the judge even consider your recommendation of the death penalty, what punishment is there for murdering that girl, for murdering the second person? . . . [The Bible says,] "Blessed are the merciful for they shall receive mercy." It doesn't say, "Blessed are the wicked and the brutal and the mean and cruel for they shall receive mercy." And if even God didn't give mercy for that, why should you? . . . Please, don't let that American feeling of forgiveness [sic], just like Harry Truman, you're a public servant. The buck stops right here.

(Trial Trans. at 740-51.) Contrary to Rodden's assertion, the prosecutor did not say Rodden would probably never be executed or that death by lethal gas would be instantaneous. We see nothing wrong with the prosecutor's allusion to Harry Truman, which the prosecutor used to emphasize the jury's grave responsibility. The prosecutor's biblical references--that Rodden was like the person who attacked the victim helped by the Good Samaritan, and that Rodden didn't deserve mercy because he was cruel rather than merciful--emphasized Rodden's individual character, see Antwine v. Delo, 54 F.3d 1357, 1364 (8th Cir. 1995), rather than invoked the wrath of God, see Bussard v. Lockhart, 32 F.3d 322, 324 (8th Cir. 1994). In context, the prosecutor's statements about the second murder being free urged the jury to impose additional punishment for the additional crime. And in commenting that another jury had convicted Rodden of killing Arnold, the prosecutor did not suggest the outcome of the Arnold murder trial should control the jury's decision in the Trunnel murder case. Rather, the prosecutor merely pointed out that Rodden was a multiple killer. The jury

-8-

could properly consider Rodden's earlier crimes in deciding whether to sentence him to death. See Wise v. Bowersox, No. 97-1139, 1998 WL 67135, at *6 (8th Cir. Feb. 20, 1998).

Even if the prosecutor's remarks were improper, defense counsel's penalty-phase closing argument minimized any prejudice. As we said earlier, Rodden's attorney countered the prosecutor's comments about the jury only recommending a sentence to the judge. As for the prosecutor's argument about the second murder being "free," defense counsel argued the State prosecuted the Arnold and Trunnel murder cases separately to get two cracks at the death penalty. In addition, Rodden's attorney pointed out Rodden would be seventy-four when he could be paroled for killing Arnold, so if the jury wanted to punish Rodden for Trunnel's murder, it could "give him another fifty years." The court also properly instructed the jury. Under the circumstances, we cannot say there is a reasonable probability the jury would have chosen a life sentence absent the prosecutor's argument. Because the prosecutor's closing argument did not violate due process, the failure of Rodden's attorney to raise the due process claim as plain error on appeal is not ineffective assistance of counsel. See Six, 94 F.3d at 477.

Rodden next claims his trial attorney was ineffective because he failed to investigate and present mitigating evidence during the penalty phase. As potential mitigating evidence, Rodden points just to his family's testimony. Rodden's trial attorney interviewed Rodden's parents before the Arnold murder trial and decided only his mother should testify. Her brief testimony, that Rodden was twenty-four and had "emotional problems from time-to-time," covers less than one page of the transcript. At the state postconviction hearing following the Trunnel trial, she blamed Rodden's problems on the school system and the police department. Rodden's father testified Rodden was "overactive," and Rodden's brothers testified they had close relationships with Rodden and participated in Cub Scouts together. Rodden's trial attorney testified he believed the substance of the family's testimony was not particularly good, and when the penalty phase of the Trunnel murder trial ended at about 10:30 p.m., he made

a strategic decision to submit the case to the jury that night rather than present marginally favorable family testimony the next day, in the hope the jury would be too tired to argue about the death penalty in the early morning hours and would impose a life sentence instead. The Missouri courts found the attorney's decision not to call Rodden's family members as witnesses was a matter of trial strategy, and there was "no clear evidence that the testimony of [Rodden's] relatives would have been beneficial." 795 S.W.2d at 397. The decision not to call family members as witnesses in the penalty phase is a strategic one that we will not second-guess in hindsight. See Fretwell v. Norris, 133 F.3d 621, 627 (8th Cir. 1998). Rodden must overcome a strong presumption that the strategy was reasonable. See id. We conclude defense counsel's strategy was not unreasonable, and it is not reasonably probable the jury would have imposed a life sentence if Rodden's family had testified at the penalty phase, see Strickland, 466 U.S. at 694.

Rodden also asserts he received ineffective assistance of trial counsel because his attorney did not call Angel Duffy, a fifteen-year-old girl, as a witness in the trial's guilt phase. At the state postconviction hearing, Duffy testified she was with Arnold at his apartment from about 6:00 p.m. to 10:00 p.m. on the night he was killed. Duffy said Arnold had been drinking and acting violently around 8:00 p.m. and had broken a coffee table around 9:00 p.m., but he had calmed down by the time she left at 10:00 p.m., before Rodden and Trunnel arrived. Trial counsel explained he did not call Duffy as a witness because he believed her testimony would not really help Rodden's case and she contradicted part of Rodden's testimony. We believe her testimony that Arnold had acted violently about nine hours before the murders but then settled down would not have been especially helpful, and her testimony about Arnold breaking the coffee table around 9:00 p.m. was inconsistent with Rodden's statement that Arnold broke the table later in Rodden's presence. We decline to second-guess counsel's strategic decision not to call Duffy. See Dodd v. Nix, 48 F.3d 1071, 1075 (8th Cir. 1995). Given the overwhelming circumstantial evidence against Rodden, we cannot say there is a reasonable likelihood the jury would have acquitted Rodden of capital

murder or sentenced him to life if Duffy's testimony had been admitted in the trial's guilt phase. See Strickland, 466 U.S. at 694.

Last, Rodden contends his Fifth Amendment rights were violated when the prosecutor used Rodden's testimony from the Arnold murder trial as evidence in the State's case-in-chief in the Trunnel murder trial. Rodden contends his waiver of his Fifth Amendment rights in the Arnold murder trial did not waive his Fifth Amendment rights in the Trunnel murder trial. In the state courts and federal district court, Rodden raised his Fifth Amendment claim only in the context of ineffective assistance of trial counsel, so we consider the claim only in that context here. See Sweet v. Delo, 125 F.3d 1144, 1149 (8th Cir. 1997), cert. denied, 118 S. Ct. 1197 (1998). We conclude Rodden suffered no prejudice from the testimony's admission because there was overwhelming evidence against him. See Strickland, 466 U.S. at 694. Further, Rodden's testimony from the Arnold murder trial presented Rodden's defense that Arnold had killed Trunnel, without subjecting Rodden to fresh cross-examination. Thus, it is not surprising that Rodden's attorney said he had no objection to the testimony's admission at the Trunnel murder trial.

Having considered all of Rodden's arguments, we affirm the district court's denial of Rodden's habeas petition.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.