STATE of Missouri, Respondent,

v.

James Edward RODDEN, Appellant.

No. 67253.

Supreme Court of Missouri,
En Banc.

April 14, 1987.
Rehearing Denied May 19, 1987.

Lee M. Nation, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Judge.

Appellant, James Edward Rodden, was convicted of the capital murder of Terry Trunnel. § 565.001, RSMo 1978.[1] The jury recommended a sentence of death, finding that the murder was committed while appellant was engaged in the commission of another capital murder, § 565.012.2(2),[2] and that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind, § 565.012.2(7).[3] Appellant appeals his conviction and sentence, raising five points of error: (1) the evidence is not sufficient to support the verdict; (2) the death penalty in this case is barred by collateral estoppel; (3) the trial court erred in sustaining the State's challenges for cause to certain members of the venire panel; (4) the jury was "death-qualified" in violation of appellant's due process rights; and (5) the death sentence is excessive and disproportionate.

Because of the sentence imposed, this Court has exclusive appellate jurisdiction.

Mo. Const. art. V, § 3. We affirm both the judgment and the sentence.

## I.

### A.

The evidence against appellant is largely circumstantial. Appellant urges that the trial court erred in failing to grant his motion for acquittal on the ground that the evidence adduced at trial was not irreconcilable with any reasonable theory of his innocence, and therefore, that the evidence was insufficient to support the verdict.

On review, we consider the evidence in the light most favorable to the verdict, affording the State all reasonable inferences from that evidence. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

This appeal is from the second of two trials resulting from the murders of Terry Trunnel and Joseph Arnold on December 6, 1983. A jury previously convicted appellant of the capital murder of Arnold and sentenced appellant to life imprisonment without eligibility for probation or parole for fifty years. This case focuses on appellant's conviction for the capital murder of Trunnel.

Because the verdict in this case rests on circumstantial evidence, the facts and circumstances upon which the State relies must be consistent with each other and with the State's hypothesis of appellant's guilt. The evidence must be inconsistent with any reasonable theory of appellant's innocence. *State v. Goddard,* 649 S.W.2d 882, 884 (Mo. banc 1983), *cert. denied* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983). The circumstances need not, however, be absolutely conclusive of guilt, nor must they demonstrate the impossibility of innocence—the mere existence of other possible hypotheses is not sufficient to remove the case from the jury. *Id.*

---

1. Repealed effective October 1, 1984, currently § 565.020, RSMo Cum.Supp.1984.

2. Repealed effective October 1, 1984, currently § 565.032.2(2), RSMo Cum.Supp.1984.

3. Repealed effective October 1, 1984, currently § 565.032.2(7), RSMo Cum.Supp.1984.

Appellant's "reasonable theory of innocence" is the same as that offered at the Arnold trial: Arnold murdered Trunnel; appellant then killed Arnold in self-defense. He asserts here, as he did on appeal from his conviction for the murder of Arnold, that because the evidence introduced against him is explained by and is not inconsistent with this "reasonable theory of innocence," the State, in effect, did no more than prove his presence at and later departure from the crime scene.

### B.

In August or September, 1983, appellant took up residence with Joseph Arnold at 24 West College Circle, Marshall, Missouri. Arnold occupied the southeast bedroom; appellant used the southwest bedroom.

#### Rodden's Testimony

1. After Arnold "rolled a joint" and poured some drinks, appellant phoned his "ex-girlfriend" Fran Jones. As a "jealousy tactic," appellant told Jones that he was "going to have sex with Terry."

2. After the call, appellant left the apartment and drove to Jones' home, where he tried to persuade her to let him in. When Jones refused, he returned to his vehicle and started to leave, whereupon he was halted by a police officer. After the officer conferred with Jones, the officer ordered appellant to leave the premises, and followed him to 24 West College Circle.

On Monday evening, December 5, 1983, appellant went to a local bar in Marshall. There, he met Terry Trunnel. Trunnel needed a ride home; appellant offered to take her there. En route, appellant asked Trunnel if she would like to smoke marijuana. Trunnel said yes. Appellant took Trunnel to the 24 West College Circle apartment; Arnold was already there. Appellant introduced Arnold to Trunnel.

It is at this point that appellant's recounting [4] of the events of that night—the basis for his theory of innocence—comes into conflict with the State's evidence. Because appellant challenges the State's refutation of his theory of innocence, we have chosen to set out appellant's story and the State's evidence in a juxtaposed manner.

#### The State's Evidence

1. Jones testified that she phoned appellant in regard to the purchase of some of appellant's furniture prior to a trip to California he and Arnold planned to take. During the conversation, Jones heard Arnold and a woman talking in the background; Jones did not recognize the woman's voice. Appellant asked if he could come over. Jones said no. Appellant became angry, telling Jones "to be quiet because Terry would hear." Appellant told Jones he was "getting tired" and that he "was going to f___ the s___ out of Terry, everything goes." He said, "Remember, everything I'm doing to Terry, I'm really doing it to you, it's just her body."

2. Approximately thirty minutes later, appellant called Jones. Appellant said he was coming over and that if he had to, he'd kick the door in. After appellant hung up, Jones called the police. At 12:35 a.m., December 6, Officer Robert King was dispatched to Jones' residence in response to her call. Upon arrival, Officer King spoke with Jones, but found no one else there. Officer King departed.

Some time later, Jones heard appellant "banging" on her door and shouting for her to let him in. Jones called the police again. Officer King returned to Jones' residence at 1:39 a.m. and saw a vehicle backing out of the driveway. Officer King stopped the vehicle and spoke to the occupant, whom he identified as appellant. King advised appellant of Jones' complaint and that she did not want appellant at her home. King told appellant to stand by the patrol car with another officer while he, King, spoke with

---

4. Appellant did not take the stand at his trial for the murder of Terry Trunnel; his testimony

from the previous trial for the murder of Joseph Arnold was introduced by the State.

Jones. Jones refused to sign a formal complaint, stating that she simply wanted appellant removed from her property. King returned to the patrol car. He noticed that appellant's vehicle bore no license plates. King followed appellant back to Arnold's apartment, and, before leaving, instructed appellant not to move his vehicle until it was properly licensed. King told appellant not to return to Jones' residence. Officer King observed appellant go into the apartment at approximately 1:53 a.m.

3. Upon entering the apartment, appellant phoned Jones again; he was "upset" because Jones had refused to talk to him.

3. Appellant called Jones again. Appellant told her that he, she, and Jan (a friend of Jones) "wouldn't live out the night."

4. After that call, appellant said he went into *his own*, the southwest, bedroom to see "who was home and who wasn't." Asked what he saw, appellant replied, "It just looked like two people making love."

Appellant returned to the living room, smoked half a joint, and went to the bathroom.

On leaving the bathroom, appellant saw what appeared to be blood on the floor leading to *his* bedroom.

Stepping into the doorway, appellant encountered Arnold and asked what was happening. At that point, appellant recounts, "[Arnold] just kind of looked down and then he looked at me and he jumped up off the bed and started coming towards me." Appellant saw that Arnold held a knife and attempted to grasp Arnold's wrist.

4. Marshall Police Chief Simmerman, a veteran of 10,000 violent death investigations as a homicide detective with the St. Louis Police Department and Chief Legal Investigator for the St. Louis Medical Examiner, is an expert in interpreting blood patterns. He explained that the amount of blood found in the *southeast* (Arnold's) bedroom led him to conclude that most of the violence had occurred in that room. A large quantity of blood was found on Arnold's water bed located against the east wall, accumulated mostly in the center and at the foot on either side of the bed.

Terry Trunnel's clothing and shoes were found in the *southeast* bedroom. The clothing was undamaged.

5. Appellant explained that his hand slid down the knife, and was cut.

5. Gloria Washam, a nurse at the Brookfield hospital where appellant received treatment, (*see* narrative *infra*) observed a wound on appellant's right hand. In response to her inquiry, appellant stated that he was injured when the jack slipped as he was changing a tire.

Dr. Don R. Dixon, who also attended appellant at the hospital, asked appellant how he had sustained the injuries to his hand. Appellant again replied that the jack slipped as he was changing a tire, injuring his hand. Dr. Dixon testified that in his opinion, the injuries to appellant's hand were not consistent with that type of accident, but appeared to be caused by a sharp object. In response to the prosecutor's hypothetical question at trial, Dr. Dixon stated his opinion that both lacerations would be consistent with the hand sliding over the blade of a butcher knife. Dixon described appellant's hand wound as being consistent with an injury caused by a hand sliding down off the handle after hitting a solid object.

6. A struggle ensued during which appellant was able to manipulate Arnold's hand, which

6. Dr. Jay Dix, a forensic pathologist, performed autopsies on the victims. The external

held the knife, in such a way as to inflict cuts on Arnold. Ultimately, appellant forced the knife into Arnold's chest "and he slumped down."

At this point, appellant pulled the knife out of Arnold and backed away. Then Arnold arose again, lowered his head, and charged at him. Appellant began swinging the knife "every which way," and felt solid contact. At some point, explained appellant, "we was hand in wrist holding each other." Appellant stated that although he was much larger, physically, he was unable to overpower Arnold.

7. Eventually, Arnold fell to the floor on his face and stopped moving. Appellant immediately picked Arnold up, saw that he was dead and "just laid him on over."

8. Then, appellant went to *his* bedroom, saw Trunnel "kind of half off the bed," picked her up and laid her across the bed. Appellant placed his hand on her chest to check for signs of life, "but there was nothing." He "didn't notice" any bindings on Trunnel's body.

examination of Joseph Arnold at the autopsy revealed a total of nine stab wounds inflicted at various points on the body. Dr. Dix described stab wounds to the back, on the forehead extending to the bone, on the left side of the cheek, and near the chin penetrating through the jaw and into the neck and chest cavity. Additionally, Arnold sustained a "cutting wound" above the right ear, and a tear at the back of the scalp. Dr. Dix stated that at least three of the nine wounds might have been the fatal injury. Arnold had no defensive or blocking wounds on his body.

Appellant had no defensive or blocking marks on his body.

7. Chief Simmerman described Arnold's corpse as lying face up with the legs bent beneath the body in an "unnatural position" for a living person to have fallen. There were "a lot of wounds to the head and face area." Blood patterns on the north wall of Arnold's bedroom and the coagulation of blood on the male's face indicated that originally, the victim had lain face down in the pool of blood (which appeared to have drained from his head wounds) for some time and that "somebody grabbed him and flipped him over backwards with enough force that he splashed blood against the wall."

8. In the *southwest* (appellant's) bedroom where Trunnel's body was found, Chief Simmerman saw some blood smears on the wall as if somebody with blood on their arm "bumped against the wall." The bed, on which the body lay face up, consisted of two mattresses stacked on top of an innerspring mattress resting on the floor. There were no bedclothes of any kind on the mattresses. There were multiple stab wounds on the female's body ranging from the legs to the chest.

The external examination of Terry Trunnel revealed eleven stab wounds, including two on the upper left arm, four on the forearm, two on the chest, one on the side of the left leg, one near the left knee and one near the right ankle. At least one of Trunnel's wounds was caused by a large knife, consistent with the butcher knife found with appellant at Purdin, Missouri (*see* narrative *infra*). Dr. Dix indicated that the wounds on Trunnel's forearm were "blocking" or "defense" wounds. According to Dr. Dix, the wound to Trunnel's upper arm "actually went through and caused a breakage of the left arm bone, the humerus." He stated that driving a knife through the outside of an arm and into the bone, causing it to break, would require a "significant" amount of force.

Chief Simmerman noted that while there was some drainage of blood from the wounds on Trunnel's right leg, which was dangling off the

stack of mattresses, the multiple gashes to her torso and arms were dry. Simmerman explained that had Trunnel's heart still been beating when she was placed on the mattress, blood would have run out of the upper wounds. The fact that they were dry indicated that there was only enough blood left in her system to drain by force of gravity down to the leg area. Simmerman concluded from this that the woman did not die on the mattress, but "had to be brought there from someplace else" after she was already dead.

There was a cord tied around the right wrist and left ankle of Trunnel's body. The cords were clearly visible to Officer Deems, the first officer on the scene, from the doorway to the bedroom.

There was no bedframe to which the cords tied to Trunnel's left wrist and right ankle might have been fastened in appellant's bedroom where Trunnel's body was found.

Simmerman explained that when Arnold's body was thrown backward, what looked to be "about a quart" of coagulating blood was exposed on the floor. The pattern of blood on the southeast bedroom floor indicated that someone had dragged a heavy object, trailed by something leaving a small serpentine line, on the floor into the hallway toward the southwest bedroom. Simmerman also indicated that it appeared that Arnold's body had been moved "to get him out of the way."

Appellant's head hair was found on Trunnel's forearm, left wrist and right ankle.

Trunnel's blood was found on the T-shirt worn by appellant at the Brookfield Hospital.

Dr. Bedford Knipschild, Saline County Coroner, examined the bodies at the scene. Based on a condition known as "livor mortis," i.e., settling of blood after death, Dr. Knipschild placed Trunnel's time of death at between 5:00 and 5:30 a.m. (Appellant arrived at the apartment at 1:53 a.m.)

9. After rearranging Trunnel's body, appellant "walked around the apartment back and forth," about an hour, during which time he was bleeding.

· Appellant spread lamp fluid and started a fire in the box in the kitchen and a fire *"in his bedroom."* "I just wanted to be rid of all — of every — all of it. I wanted it to be a bad dream — to make it go away," he said.

9. Simmerman observed areas of yellowish discoloration on the corpse's abdomen, chest and pelvis, as if "somebody had placed something burning or *placed something on her and burned it."* He described the blood pattern from a wound on the woman's right leg as looking like "it had dried down across something that was foreign on her leg, something that is already greasy and the blood didn't stick to it and its falling down onto the floor."

Marshall Assistant Fire Chief Woodland testified that cinnamon-scented combustible liquid was found on the leg of the female body where it appeared to have "displaced the blood" on her calf.

10. After "walking around" for approximately an hour, and then attempting to set fire to the apartment, appellant changed clothes and departed in Arnold's Ford which had a license plate and was in better condition than his car. Appellant said he was also unable to find his car keys.

Woodland observed some kind of burnt material on the floor. He also saw several burns on the woman's body. Woodland described these as a broad second-degree burn from the left arm pit across both breasts, a long third-degree triangular burn on the waist, a large third-degree burn "about the size of a grapefruit" on the right hip, and several smaller second-degree burns on the right hip and abdomen.

Woodland concluded that fire had been ignited at two points in the apartment: a cardboard box in the kitchen and the bed where the female corpse lay. In his opinion, the ignition at both points "could only have been intentional."

10. Just after 6:00 a.m., on December 6, Eddie Walker, a neighbor, observed appellant leaving Arnold's apartment. Dr. Knipschild fixed Trunnel's time of death at between 5:00 and 5:30 a.m. (*see* para 8, *supra*).

---

At approximately 9:00 a.m., December 6, Trooper Dwight Hartung responded to a reported accident at the home of Ferrell Lewis, located in Purdin. Upon arrival, Trooper Hartung saw a blue Ford lodged under the porch roof of the Lewis house and a man lying on an ambulance stretcher just inside the front door. Hartung radioed the Ford's license plate number to patrol headquarters, and was advised that the vehicle was registered to Robert Arnold. The man on the stretcher identified himself to Officer Hartung as "James Rodden."

By his own account, appellant had left the apartment in Arnold's car, heading north toward Iowa. When he got as far as Purdin, however, he began feeling "real hot and real lightheaded," lost consciousness and drove into the front of Ferrell Lewis' house. Appellant was taken by ambulance to the Brookfield, Missouri, hospital.

After the ambulance departed, Trooper Hartung looked inside the Ford and saw a wooden-handled butcher knife, several beer cans and a bottle marked "Christian Brothers Brandy." Hartung secured the car and left for the hospital.

Appellant received medical attention at the hospital in Brookfield, Missouri. After receiving treatment, police officers took appellant to the Brookfield Police Department. There, appellant gave police permission to search the impounded Ford. Items removed from the Ford included a butcher knife, a fleece seat cover, a green bed sheet, a bottle of Christian Brothers brandy, an ice scraper, and blood scrapings from a metal tool box.

## C.

Appellant, frustrated by Jones' rejection, arrived at the apartment at 1:53 a.m. He called Jones a final time, warning her that she, and he, would not live out the night.

Other than appellant, only Arnold could have killed Trunnel. Appellant's own story suggests that Trunnel disrobed prior to appellant's 1:53 a.m. arrival; the location and undamaged condition of her clothing reasonably infers that Trunnel did not disrobe under conditions of physical violence. Trunnel died between 5:00 and 5:30 a.m., at least three hours after appellant arrived.

The only believable evidence is that Trunnel was killed in Arnold's bedroom and dragged, cords dangling from her body,

already dead, into appellant's bedroom. Arnold's body was thrown aside to allow Trunnel to be dragged away. She died as a result of an exceedingly brutal and violent struggle—a struggle so violent that one stab fractured her upper arm bone.

It is impossible to believe that a struggle of this nature between Arnold and Trunnel could be mistaken for "making love" or escape the attention of appellant as he sat calmly in the living room "smoking half a joint."

The only believable evidence and the only reasonable inferences which can be taken from that evidence are not only inconsistent with any theory of innocence but consistent with the State's theory of guilt.

The evidence of appellant's actions after departing Arnold's apartment also reasonably tends to rebut any theory of innocence.

First, by his own admission, appellant attempted to destroy the crime scene by fire. Significantly, the evidence shows that combustible liquid was poured on Trunnel's body and ignited at several points. The jury was not required to believe appellant's explanation that he simply "wanted it to be a bad dream" and to "make it go away." *State v. Holt*, 592 S.W.2d 759, 774 (Mo. banc 1980).

■ Second, by his own account, appellant was bleeding severely after the alleged assault by Arnold, and admitted that while he saw no signs of life, he was not certain that Terry Trunnel was dead. Nevertheless, appellant did not seek medical attention for himself or Trunnel, or notify anyone of what had allegedly happened. Instead, he fled the crime scene in Arnold's car, taking with him a butcher knife which bore the blood of one, and perhaps both, of the victims.[5] Appellant's flight ended only when he lost consciousness and crashed into Ferrell Lewis' porch at Purdin. Appellant's flight was admissible to show a consciousness of guilt contrary to any theory of innocence. *State v. Kilgore*, 447 S.W.2d

544, 547 (Mo.1969); *State v. Summers*, 660 S.W.2d 772, 773 (Mo.App.1983); *State v. Logan*, 617 S.W.2d 433, 435 (Mo.App.1981).

■ Third, appellant told Gloria Washam and Dr. Dixon that he had injured his hand while changing a tire. This, of course, was untrue. Exculpatory statements, when proven false, evidence a consciousness of guilt and therefore bear directly on the issue of guilt or innocence. *State v. Zerban*, 412 S.W.2d 397, 399–400 (Mo.1967); *State v. Ross*, 606 S.W.2d 416, 425 (Mo. App.1980).

■ Facts, of course, do not speak for themselves. "They speak for or against competing theories." T. Sowell, *A Conflict of Visions*, 16 (1987). Based upon the facts and circumstances of this case, we find that the State's evidence and the inferences reasonably drawn therefrom in the light most favorable to the verdict are consistent with each other and the State's theory of appellant's guilt. They are inconsistent with any reasonable theory of appellant's innocence. The jury properly found that appellant killed Terry Trunnel. Appellant's first point is therefore denied.

## II.

■ Appellant was previously tried and convicted in the Circuit Court of Phelps County of the capital murder of Joseph Arnold. *State v. Rodden*, 713 S.W.2d 279 (Mo.App.1986). The jury in that case sentenced appellant to life imprisonment without possibility of parole for fifty years. *Id.* at 280. Prior to the present trial, appellant filed a motion to preclude the State from seeking the death penalty on the theory that because he was not sentenced to death for the murder of Joseph Arnold at his previous trial, the doctrine of collateral estoppel barred any consideration of the death penalty for the murder of Terry Trunnel. This theory was rejected by the trial court, and is now being advanced on appeal.

---

5. Dr. Kwei Lee Su, Chief Forensic Serologist at the Missouri State Highway Patrol crime laboratory, testified that blood samples taken from

the butcher knife were consistent with both Arnold's and Trunnel's blood type.

The principle of collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). An essential requirement for the application of collateral estoppel is that "the issue decided in the prior adjudication was *identical* with the issue presented in the present action." *Hudson v. Carr*, 668 S.W.2d 68, 70 (Mo. banc 1984), *quoting Oates v. Safeco Ins. Co. of America*, 583 S.W.2d 713, 719 (Mo. banc 1979) (emphasis in original). "Collateral estoppel forecloses a party from litigating only those exact issues unambiguously decided in the earlier case." *Owens v. Government Employees Ins. Co.*, 643 S.W.2d 308, 310 (Mo.App.1982). Under these principles, collateral estoppel has no application in the present case.

The issue before the Phelps County jury was whether appellant should receive a sentence of death for the murder of Joseph Arnold. While evidence regarding the killing of Terry Trunnel was before them, the Phelps County jury was not asked to determine guilt or to assess punishment for that act.

Trunnel's body showed more evidence of abuse than that suffered by Arnold; she had been stabbed eleven times, once through the arm with enough force to break the bone. After her death, appellant poured a combustible liquid on her body and tried to set her afire.

Not only does this case involve a different victim, but the facts demonstrate different circumstances surrounding each death. It cannot be said that the Arnold and Trunnel murders present identical issues so that assessment of a life sentence as punishment for the former must bar consideration of death as a penalty for the latter. The appropriateness of capital punishment for the murders of Joseph Arnold and Terry Trunnel are simply not "identical" issues.

We find that the trial court properly rejected appellant's claim of collateral estoppel.

### III.

Appellant next raises two points of error focusing on the jury selection process.

### A.

Appellant first argues that six members of the venire who expressed opposition to the death penalty were erroneously removed for cause. Absent a clear abuse of discretion, the trial court's ruling will not be disturbed on appeal. *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983).

### 1.

■ The record provides ample evidence for the disqualification of four of the six stricken veniremen. In response to individual questioning by counsel, each person expressed emphatic opposition to the death penalty, indicating that under no circumstances could he or she return a sentence of death. Such testimony demonstrated that these persons were "substantially impair[ed]" in their ability to serve as jurors in accordance with their instructions and their oath. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Adams v. Texas*, 448 U.S. 38, 48, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980); *State v. Young*, 701 S.W.2d 429, 432 (Mo. banc 1985). The responses were unequivocable, unwavering and more than sufficient to sustain a challenge for cause.

### 2.

■ The remaining two members of the venire removed for cause, Benner and Berger, initially stated that they would be unable to consider imposing the death penalty regardless of the facts and circumstances adduced at trial. However, both later suggested that they might be able to consider capital punishment in a certain hypothetical situation. Ms. Benner stated that she could consider imposing a sentence of death only if one of her relatives was the victim. Mrs. Berger stated that she could never recommend death except in genocide

situations like the Holocaust, in which the perpetrator had killed millions of people.

This Court has consistently held in cases presenting similar facts that a venireman's indication of willingness to consider the death penalty in extreme hypothetical situations does not render him immune from exclusion from the jury for cause. *State v. Zeitvogel,* 707 S.W.2d 365, 367 (Mo. banc 1986); *State v. Johns,* 679 S.W.2d 253, 264–65 (Mo. banc 1984). Here, both of the challenged veniremen not only indicated their personal hostility to death as a punishment option, but also expressed unequivocal opposition to the death penalty in a case like that before them. The trial court did not abuse its discretion in finding that these individuals were substantially impaired in their ability to judge the issue of punishment fairly and in accordance with their instructions and their oath.

### B.

Appellant next asserts that the voir dire in this case was conducted in such a manner as to empanel a jury committed or predisposed to impose the penalty of death.

Defense counsel lodged no objection on this ground at any point during voir dire; neither was it advanced in appellant's Motion for New Trial. Therefore, our review is limited to an examination for plain error. We reverse only where a manifest injustice or miscarriage of justice occurred.

The precise theory upon which appellant bases his claim of error is not entirely clear from his brief. His position is either (1) that inquiry during voir dire focusing on attitudes toward the death penalty is inherently improper because it predisposes the jury in favor of capital punishment, or (2) that the prosecutor in this case obtained from the potential jurors a commitment to return a sentence of death.

### 1.

If it be the former, appellant's argument is untenable under state and federal law.

■ Voir dire examination focusing on the attitudes of venire members toward the death penalty is not designed to forge a commitment to the death penalty. Instead, the exercise seeks to discover potential jurors who are committed to considering the full range of punishment provided by state law for capital (now first-degree) murder. *Witherspoon v. Illinois,* 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968). If a venireman demonstrates his inability to so commit, he is by definition unable to follow the instructions of the court or his oath as a juror. He is excludable for cause. *Wainwright,* 105 S.Ct. at 852; *Young,* 701 S.W.2d at 432–33.

A constitutional challenge to the death-qualification process was recently rejected in *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), where the Court stated that "an impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *Id.* at ——, 106 S.Ct. at 1767, *quoting Wainwright,* 105 S.Ct. at 852 (emphasis omitted). Under *Lockhart,* any claim by appellant that the death-qualification process inherently results in an unconstitutional deprivation of the right to impartial jury is without merit. *State v. Driscoll,* 711 S.W.2d 512, 517 (Mo. banc 1986).

### 2.

■ If appellant's argument is that the prosecutor impermissibly sought a commitment from potential jurors to return a sentence of death under the facts of the case before them, such a claim is squarely refuted by the record. At no point during the death penalty inquiry process did the State ask how a potential juror would vote under the facts of the case before him. To the contrary, the prosecutor apologized several times to members of the venire that his probe into their views on capital punishment could not be made in reference to the facts of the case they would hear. Appellant's suggestion that the prosecutor obtained a commitment from the jury merely by informing them that the State intended to seek the death penalty borders on frivolity.

We find no error, plain or otherwise, in the death penalty inquiry of potential jurors in this case.

## IV.

Finally, appellant argues that the death penalty in this case is excessive and disproportionate to similar cases, considering the crime and the defendant, and that this Court, in its exercise of independent review, should set aside his sentence. § 565.014.3(3), RSMo 1978.[6]

Appellant does not claim, and the record does not support a finding that the sentence was imposed under influence of passion, prejudice or any arbitrary factor. § 565.014.3(1), RSMo 1978.[7] Nor does he claim that the aggravating circumstances found by the jury were unsupported by the evidence. § 565.014.3(2).[8]

The facts of this case show a level of inhumanity and depravity similar to other cases in which the death penalty was imposed upon a finding that the murder involved torture or depravity of mind and that, as a result thereof was outrageously or wantonly vile, horrible or inhuman. *State v. Jones*, 705 S.W.2d 19 (Mo. banc 1986), *cert. denied* — U.S. ——, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Preston*, 673 S.W.2d 1 (Mo. banc 1984), *cert. denied* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), *cert. denied* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. Trimble*, 638 S.W.2d 726 (Mo. banc 1982), *cert. denied* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982), *cert. denied* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), *cert. denied* 459 U.S. 884, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981), *cert. denied* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

Terry Trunnel did not die quickly. She was stabbed eleven times in the chest, back, arm and leg. The "blocking wounds" on her arm demonstrate that she was conscious during the attack and attempted to fend off appellant's knife. Dr. Dix testified that Trunnel would have remained conscious for approximately ten minutes even after she suffered the fatal injuries to her lungs. Thus, not only was Trunnel the victim of brutal physical abuse, but she had ample time to contemplate her fate. *Smith*, 649 S.W.2d at 434; *LaRette*, 648 S.W.2d at 102; *Trimble*, 638 S.W.2d at 731; *Mercer*, 619 S.W.2d at 4. After she died, Trunnel's body was mutilated by appellant, who poured a combustible liquid on it and set her afire. *Jones*, 705 S.W.2d at 20–21.

As to the nature of appellant, the evidence demonstrates his lack of remorse for the murder. Appellant made detailed efforts to destroy the incriminating evidence and escape the scene. He splashed lamp oil throughout the apartment and ignited it in both the kitchen and in the southwest bedroom on Trunnel's body. He fled in Arnold's car taking with him the murder weapon. Appellant's escape was foiled only by his weakness from loss of blood.

Further, the fact that appellant is a multiple murderer was before the jury. His willingness to kill, and kill again, merits even greater societal concern than individual homicide and particularly warrants imposition of the ultimate punishment. *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986), *cert. denied* — U.S. ——, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984), *cert. denied* 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).

Appellant asserts his youth and the fact that he had been drinking and smoking marijuana as mitigating circumstances; neither is sufficient to warrant a reduction of this sentence. The death penalty has been upheld in several cases in which the

6. Repealed October 1, 1984, currently § 565.-035.3(3), RSMo Cum.Supp.1984.

7. Repealed October 1, 1984, currently § 565.-035.3(1), RSMo Cum.Supp.1984.

8. Repealed October 1, 1984, currently § 565.-035.3(2), RSMo Cum.Supp.1984.

defendant was younger than appellant's 23 years at the time of the crime. *State v. Lashley,* 667 S.W.2d 712, 716 (Mo. banc 1984), *cert. denied* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984) (17 years old); *Battle,* 661 S.W.2d at 488, 494 (18 years old); *Trimble,* 638 S.W.2d at 730 (20 years old). In regard to the second factor he offers in mitigation, the record is devoid of evidence to support a claim of mental impairment or lack of responsibility by reason of alcohol or drug abuse. As such, the mere fact that appellant partook of intoxicants prior to the murder is an insufficient basis upon which to set aside his sentence. *Preston,* 673 S.W.2d at 8.

Upon consideration of the crime, the defendant and other cases in which the death penalty has been imposed, we find this sentence neither excessive nor disproportionate in this case.

The judgment of guilt for capital murder and the sentence of death are affirmed.

All concur.