STATE of Missouri, Respondent,

v.

Jeffery Paul SLOAN, Appellant.

No. 69330.

Supreme Court of Missouri,
En Banc.

July 26, 1988.
Rehearing Denied Sept. 13, 1988.

Michael Lerner, Overland Park, Kan., Robert G. Duncan, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

DONNELLY, Judge.

This is a direct appeal from the Circuit Court of Clay County challenging the imposition of the death sentence. We have jurisdiction. Mo. Const. art. V, § 3. Affirmed.

### I.

The facts are not in dispute. Appellant Jeffery Sloan, then nineteen, lived in a house near Lathrop, Missouri, with his parents, Paul and Judith, and two brothers, Timothy, eighteen, and Jason, nine. A dispute arose in the summer of 1985 between appellant and his father concerning some checks that appellant had written on Paul Sloan's bank account in order to buy drugs. On the night of December 10, 1985, appellant learned that his father had discovered that appellant had written two more checks on his father's account. Later that night, he told a girlfriend, Jennifer Jordan, that his family had received a number of threatening notes and telephone calls.

The following morning, appellant loaded a .38 caliber pistol that he kept under his mattress. He went to his parents' bedroom and shot his father, the bullet striking Paul Sloan's chin and passing through his neck. Appellant's mother, awakened by the blast, sat up in bed and was met by a second blast from her son's gun. The bullet ripped through Judith Sloan's right breast, neck and cheek. Appellant proceeded to the living room, where his two brothers normally slept. Appellant shot Timothy at close range as Timothy was getting up off his bed, the bullet passing through Timothy's left hand and damaging his cheek. Appellant turned to Jason, who earlier had been watching television but now was completely covered by a blanket. Appellant placed the muzzle of the gun against the blanket and pulled the trigger. The bullet travelled through Jason's left wrist and into the top of his head, exiting through the back of his head. Jason died from the head wound.

Appellant reloaded and returned to his parents' bedroom. Finding both of his parents still alive, appellant shot Judith Sloan in the back of the head. Appellant shot his father again, this time in the right eye, the bullet lodging in Paul Sloan's skull. Timothy, the only member of appellant's family still alive, attempted to escape through the front door, but a bullet to the left temple ended his flight in the yard of the Sloan home. Appellant then left for work, throwing the gun, holster, and shells into heavy brush along the way.

Once at work, appellant phoned Jennifer Jordan and asked her to call or go by the Sloan residence and tell Paul Sloan that appellant had reached work safely. Jennifer and her mother went to the Sloan residence to deliver the message and discovered Timothy Sloan's corpse outside of the house. The authorities were contacted, and Mrs. Jordan called appellant and told

him to come home. Law enforcement officials arrived before appellant and did not allow appellant to enter the house. Appellant was then placed in a police car where he voluntarily stated that Willis Atterbury had killed the Sloan family. Atterbury had had an affair with Judith Sloan. At the time of the accusation, appellant had not seen the bodies of his parents and Jason.

Appellant was taken to the county courthouse. Along the way, appellant was advised of, and waived, his *Miranda* rights. He continued to blame Atterbury for the murders. Several hours later, following a visit from his grandfather, appellant confessed to the killings and led officers to the discarded gun, holster, and shells. Appellant gave two videotaped statements in which he described the killings in detail and claimed that his mother had ordered him to murder his entire family.[1]

Appellant was charged with four counts of first degree murder. Venue was changed from Clinton County to Clay County, and five days before the trial the State dismissed, without prejudice, the charges involving the murders of Paul, Judith and Timothy Sloan. Appellant pleaded not guilty by reason of mental disease or defect excluding responsibility, claiming he was influenced by his allegedly insane mother. At trial, the videotaped confessions were admitted into evidence and played before the jury without objection. The jury rejected appellant's defense and found appellant guilty of first degree murder in the death of Jason Sloan, § 565.020.1, RSMo 1986. The jury then declared the punishment at death, finding the statutory aggravating circumstances to be that the murder of Jason Sloan was committed while appellant was engaged in the commission of the unlawful homicide of Timothy Sloan, § 565.032.2(2), RSMo 1986, and that the murder of Jason Sloan involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman, § 565.032.2(7), RSMo 1986.

Appellant does not challenge the conviction. Rather, appellant raises three points challenging the imposition of the death sentence.

## II.

Appellant contends that the trial court erred in not striking for cause venirepersons Blair, Davison, and Jaynes during the death qualification stage of voir dire.[2] All three were eventually removed by appellant through peremptory strikes.

The proper standard for determining whether a venireperson may be removed for cause during death qualification is "whether the [venireperson's] views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980)); *State v. Antwine,* 743 S.W.2d 51, 60 (Mo. banc 1987), *cert. denied* —— U.S. ——, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). Such a determination should not be based on a single response but should be based on the entire voir dire examination. *State v. Smith,* 649 S.W.2d 417, 425–26 (Mo. banc 1983), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Considerable discretion lies with the trial court in determining the qualifications of venire-

1. Judith Sloan allegedly told appellant to kill Paul Sloan because he was abusive, kill Timothy because he was like his father, and kill Jason in order to save him from growing up with the knowledge that his father was abusive.

2. Appellant's Point Relied On reads "[t]he court erred in failing to exclude over appellant's objection certain venire persons during the death qualification stage of the jury selection process, specifically jurors Davison, Blair, and Jaynes." The State argues that the point fails to comply with Rule 30.06(d) and is thus reviewable only for manifest error. Rule 30.20. While it is apparent that the point does not state "wherein and why" the trial court erred, appellant's arguments make clear the grounds for alleged error. Since it is this Court's policy "to decide cases on the merits whenever possible" and to avoid "punish[ing] innocent parties for the shortcomings of counsel on appeal," *Thummel v. King,* 570 S.W.2d 679, 690 (Mo. banc 1978), particularly in criminal cases, we treat appellant's point of error as if properly raised.

persons; absent an abuse of that discretion, the trial court's ruling will not be overturned on appeal. *State v. Antwine*, 743 S.W.2d at 60–61; *State v. Smith*, 649 S.W.2d at 422.

The venirepersons in question were members of the initial panel of thirteen examined. The prosecutor, Mr. Finnical, opened the questioning by asking whether the venirepersons could recommend the death penalty in an appropriate case, and all three answered affirmatively. In addition, venirepersons Blair and Jaynes indicated that they could recommend life imprisonment without parole. Questioning by Mr. Lerner, the defense counsel, resulted in the following pertinent exchanges:

MR. LERNER: And you don't know what the facts are, but can you think of a circumstance if you've already ... found [appellant] guilty of first degree murder ... where you wouldn't impose the death penalty? ...

VENIREPERSON DAVISON: Well, I'd have to say right now, no, I cannot.

MR. LERNER: So, if you got to the point where you believed [appellant] guilty of first degree murder, then you feel that you'd have to vote for death, is that correct?

VENIREPERSON DAVISON: Yes, I think that is correct.

....

MR. LERNER: ... Mrs. Davison was very honest with us. She said that if I voted for murder I'd have to impose the death sentence. And I don't know of any circumstances that I can think of, once I voted for murder, where I could think of life without parole, it would have to be death. How do you feel about that?

VENIREPERSON BLAIR: I'd have to go along with what Mrs. [Davison] said.

....

MR. LERNER: All right. And why is that?

VENIREPERSON BLAIR: If the facts were proven that the man was guilty and I voted guilty, then I would have to vote for capital punishment.

MR. LERNER: For death?

VENIREPERSON BLAIR: Yes.

MR. LERNER: And even though there'll be an opportunity ... for you to vote for life without parole, you feel that in your heart once you got to the point of saying he's guilty of murder in the first degree, that you'd have to vote for the death penalty?

VENIREPERSON BLAIR: Yes, sir.

....

MR. LERNER: Well, let's do it this way, once you determined that it's first degree murder as the charge is____ ·

VENIREPERSON JAYNES: Yes.

MR. LERNER: ____would your decision be death?

VENIREPERSON JAYNES: Yes.

MR. LERNER: And then you wouldn't have any qualms at all with that decision?

VENIREPERSON JAYNES: No.

MR. LERNER: And it wouldn't be life without parole?

VENIREPERSON JAYNES: (No response).

MR. LERNER: Come on, be honest.

VENIREPERSON JAYNES: No.

MR. LERNER: ... And, so, you don't feel, if I'm correct, that once you voted guilty of first degree murder, that in your heart that there could be any other sentence but death, do you?

VENIREPERSON JAYNES: Correct.

The prosecutor then reexamined the three venirepersons:

VENIREPERSON DAVISON: If you got to that stage where you said guilty of murder in the first degree, then I would say death because that's the way I feel.

....

MR. FINNICAL: In other words, if the judge instructed you that you were to consider both life in prison without parole or death, you couldn't follow the judge's instructions and you'd have to give death?

VENIREPERSON DAVISON: Well, no, sir, I swore that I would follow the judge's instructions.

....

MR. FINNICAL: ... But, what I'm asking you is, do you understand the scenario here; ... if you're selected as a juror you're gonna sit in these chairs and you're gonna listen to testimony from this witness stand. And if you find the defendant ... guilty of murder in the first degree, then you're going to be coming back here and you're going to have another quick hearing. And then you're going to go back in there, after the judge reads you some more instructions, and the two possible alternatives are going to be life in prison without parole or death. Now, the question is, Mrs. Davison, ... can you conceive of a fact situation under which you could return a verdict of life in prison without parole, depending on what the facts are?

VENIREPERSON DAVISON: Yes, sir, I could conceive of that. But, it, this is a very difficult thing at this time to say, because I don't know.

MR. FINNICAL: You don't know what the facts are?

VENIREPERSON DAVISON: No.

. . . .

MR. FINNICAL: I think I understand now. You could conceive of a fact situation under which you could recommend life in prison without parole to somebody who has been convicted of murder in the first degree?

VENIREPERSON DAVISON: Yes.

MR. FINNICAL: And, by the same token, you can conceive of facts under which you can give the death penalty?

VENIREPERSON DAVISON: I could, I just cannot answer that truthfully without hearing all of the facts. I'm not saying that I am so hard headed that I'm gonna say it's going to be death, period.

MR. FINNICAL: Okay.

VENIREPERSON DAVISON: Because it's not.

MR. FINNICAL: So, you could consider both options?

VENIREPERSON DAVISON: Yes.

MR. FINNICAL: And the reason why you can consider both options is at this point you haven't heard the facts?

VENIREPERSON DAVISON: True

MR. FINNICAL: And you haven't said, I'm so for the death penalty that I will always go death, it just depends on the facts?

VENIREPERSON DAVISON: Right.

. . . .

MR. FINNICAL: ... If you found [the defendant] guilty of murder in the first degree in the first stage, would you have to give him death, or could you consider life without parole as one of the possibilities?

VENIREPERSON BLAIR: Yes, I could.

MR. FINNICAL: You could consider life without parole?

VENIREPERSON BLAIR: Yes.

MR. FINNICAL: Did you understand Mr. Lerner's question when he asked you that?

VENIREPERSON BLAIR: Not completely.

. . . .

MR. FINNICAL: So, could you conceive, Mrs. Jaynes, of a fact situation under which you could recommend or vote life without parole?

VENIREPERSON JAYNES: Yes, sir, I could.

MR. FINNICAL: And could you also conceive of a situation, and have the capability, to bring a death verdict?

VENIREPERSON JAYNES: Yes.

MR. FINNICAL: So, at this point, Mrs. Jaynes, you haven't excluded from your consideration either one of the punishments, is that a fair statement?

VENIREPERSON JAYNES: Yes.

An examination of the entire record of voir dire provides sufficient evidence to support a conclusion that the three venirepersons in question were able to perform the duties of a juror in accordance with the court's instructions and their oath. Much of the confusion arose due to the voir dire questions being framed in such a way that the venirepersons were asked whether they could reach a certain result, rather than whether they would be able to follow the instructions given by the court. *See State v. Mathenia,* 702 S.W.2d 840, 843 (Mo. banc

1986), *cert. denied* 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986). Nevertheless, all three ultimately stated that they would be able to consider both the death penalty and life in prison without parole should they find appellant guilty of first degree murder. The trial court did not abuse its discretion in refusing appellant's motion. Appellant's point is denied.

### III.

Appellant raises two other points in opposition to the death penalty. Appellant first contends that the trial court erred in submitting Instruction 18,[3] which submitted to the jury the statutory aggravating circumstances necessary to warrant the death penalty. Instruction 18 precisely follows MAI–CR 3d 313.40. The thrust of appellant's arguments on this point thus relates to the sufficiency of the evidence supporting the circumstances. In his second point, appellant contends that "[t]he penalty of death in this case is excessive and disproportionate to similar cases, considering the crime and the appellant, and the death sentence was imposed under the influence of passion and prejudice." Both of these points fall under the mandatory independent review required of this Court in all cases in which a death sentence is imposed, § 565.035, RSMo 1986,[4] and appellant's arguments will be addressed accordingly.

### A.

■ Our first statutory duty is to determine whether the imposition of the death sentence was the result of passion, prejudice, or any other arbitrary factor. Appellant argues that certain photographs depicting the crime scene and the victims' bodies, admitted over objection, were prejudicial, particularly since appellant stipulated to killing his family and the manner in which the victims were killed. The prejudicial impact of properly admitted photographs does not provide grounds for relief from a death sentence under our mandatory review. *State v. Foster*, 700 S.W.2d 440, 444–45 (Mo. banc 1985), *cert. denied* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986); *State v. Battle*, 661 S.W.2d 487, 493 (Mo. banc 1983), *cert. denied* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). The photos were relevant to establish the identity of the victims and the manner of their deaths and to corroborate and clarify the testimony of the trial witnesses, including appellant's own description of the kill-

---

3. Instruction 18 reads:

   In determining the punishment to be assessed against the defendant for the murder of Jason Sloan, you must first unanimously determine whether one or more of the following aggravating circumstances exist:

   1. Whether the murder of Jason Sloan was committed while the defendant was engaged in the commission of another unlawful homicide of Tim Sloan.

   A person commits the unlawful homicide of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter.

   2. Whether the murder of Jason Sloan involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman.

   You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

   Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstanc-

es exist, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

4. Section 565.035, RSMo 1986, reads, in part,

   1. Whenever the death penalty is imposed in any case, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the supreme court of Missouri....

   ....

   3. With regard to the sentence, the supreme court shall determine:

   (1) Whether the sentence of death was imposed under the *influence of passion*, prejudice, or any other arbitrary factor;

   (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

   (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

ings. Admission of the photographs was not error. The fact that appellant admitted to the killings and manners of death is of little consequence; "the State [is not] precluded from introducing [a] photograph because the defendant expresses a willingness to stipulate to some of the issues involved." *State v. Schneider*, 736 S.W.2d 392, 403 (Mo. banc 1987), *cert. denied* — U.S. ——, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988).

▉ Appellant next contends that certain statements made by the prosecutor during closing arguments in the punishment stage improperly influenced the jury. The prosecutor had mentioned soldiers who had given their lives in combat and then made the following comment:

> And if they died honorably so that we can be free from fear, why should not the law apply and those people like Jeffery Sloan, who murder children, die dishonorably for the same reason? Is it that Jeffery Sloan's blood is more valuable than people who honorably give their lives so we can be free from fear? I think not.

Defense counsel's objection was sustained. Later, the prosecutor stated:

> We are a nation of laws. And we don't change the law for just particular circumstances. If the law is to be enforced, especially in these types of cases where somebody brutalizes a baby, we must. Because if we fail to do that in this case, it says something about us and our society.

The first statement was found to be improper. However, "[r]eversal is not required in every instance in which the prosecutor steps beyond the boundary of proper argument." *State v. Gilmore*, 681 S.W.2d 934, 944 (Mo. banc 1984). It cannot reasonably be stated, considering the facts of this case, that the jury was influenced in its punishment deliberations by this isolated statement. *See State v. Stuckey*, 680 S.W. 2d 931, 937 (Mo. banc 1984). The second statement is a legitimate plea for strict law

enforcement. *See State v. Gilmore*, 681 S.W.2d at 944.

We have reviewed the entire record and find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

### B.

Our second duty is to determine whether the statutory aggravating circumstances found by the jury are supported by the evidence. First, appellant challenges the submission of the aggravating circumstance that the murder of Jason was committed while appellant was engaged in the commission of the unlawful homicide of Timothy Sloan. Appellant bases this argument on the fact that the State had dropped the murder charge related to the killing of Timothy. Second, appellant argues that there was insufficient evidence to support a finding that the murder of Jason Sloan involved depravity of mind.

▉ We will affirm a death sentence based on the finding of one valid statutory aggravating circumstance, regardless of the failure of another. *State v. Zeitvogel*, 707 S.W.2d 365, 369 (Mo. banc 1986), *cert. denied* 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed. 2d 168 (1986).

▉ Appellant contends that "[t]he aggravated circumstance of 'whether the murder was committed while the appellant was engaged in the commission of another unlawful homicide of Tim Sloan', was improperly relied upon for the reason that the state had dismissed the charges against the appellant for the murder of Tim Sloan prior to the commencement of trial and, therefore, was collaterally estopped from relying on the murder of Tim Sloan as an aggravated circumstance." No other mention is made of "collateral estoppel." [5] Rather, appellant argues that this aggravating circumstance is improper unless defendant has been charged with the predicate unlawful homicide

In *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978), the de-

---

**5.** Clearly, collateral estoppel does not apply in this case, since there is no earlier final judgment

on which to base the doctrine. *See State v. Rodden*, 728 S.W.2d 212 (Mo. banc 1987).

fendant was convicted of three capital felonies, and the death penalty was imposed for all three convictions based on a statutory aggravating circumstance that the capital felonies were committed while defendant was engaged in the commission of another capital felony. The Georgia Supreme Court vacated two of the sentences on the ground that the jury had not properly found that the defendant had committed forcible rape, one of the capital felonies allegedly committed. However, the court upheld the third death sentence, which was based on the aggravating circumstance that the capital felony of murder was committed while defendant was engaged in the commission of "kidnapping with bodily harm, aggravated sodomy." The court concluded that aggravated sodomy could not provide the bodily harm element of the aggravating circumstance. However, forcible rape included bodily harm as an element; since the evidence supported a finding of forcible rape, forcible rape supplied the element of bodily harm associated with the aggravating circumstance. The Supreme Court reversed, holding that forcible rape would not satisfy the statutory aggravating circumstance where the jury made no finding that defendant had committed forcible rape.

Appellant relies on the following language in *Presnell:*

> "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made....
>
> "To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court."

These fundamental principles of procedural fairness apply with no less force at the penalty phase of the trial in a capital case than they do in the guilt-determining phase of any criminal trial. *Id.,* 439 U.S. at 16, 99 S.Ct. at 236–37 (quoting *Cole v. Arkansas,* 333 U.S. 196, 201–02, 68 S.Ct. 514, 517, 92 L.Ed. 644,

647–48 (1948)). Appellant argues that this language requires the unlawful homicide on which the statutory aggravating circumstance is based to be charged along with the capital murder. Such a reading would require a full jury trial on the merits of the underlying unlawful homicide before it could be used as a basis for the aggravating circumstance.

Appellant interprets *Presnell* too broadly. *See generally Cabana v. Bullock,* 474 U.S. 376, 387, 106 S.Ct. 689, 697–98, 88 L.Ed.2d 704, 717 n. 4 (1986) ("the Presnell Court appeared to assume that the jury's constitutional role in determining sentence was equivalent to its role in determining guilt or innocence. This assumption, of course, is no longer tenable in light of our holding in *Spaziano v. Florida,* 468 U.S. [447], 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)"). Procedural due process certainly applies to the penalty phase of a capital murder trial. However, the "fundamental principles of procedural fairness" are met where the capital murder defendant is placed on notice of the aggravating circumstance on which the death penalty will be sought, *see* § 565.005, RSMo 1986, the jury is properly instructed as to the elements of the circumstance and that the circumstance must be unanimously found beyond a reasonable doubt, and the jury so finds the aggravating circumstance. *Cf. State v. Jenkins,* 494 S.W.2d 14 (Mo.1973).

These procedural standards were met in this case. More than a month before trial the State filed a notice of intent to seek the death penalty, wherein the State claimed its intent to prove "[t]he murder in the first degree offense was committed while the offender was engaged in the commission or the attempted commission of another unlawful homicide." At the time of filing, appellant was charged with all four homicides, so appellant was placed on notice that any of the homicides might be used as a basis for the statutory aggravating circumstance. The jury was properly instructed on the necessity of a unanimous finding that the circumstance existed beyond a reasonable doubt. The jury returned a verdict finding the existence of the circumstance.

Moreover, the videotaped confessions played before the jury, in which appellant described in detail the killing of Timothy, clearly provide sufficient evidence to support the submission and finding of the aggravating circumstance.

We hold that the aggravating circumstance of whether the murder of Jason was committed while appellant was engaged in the unlawful homicide of Timothy Sloan was properly submitted and supported by the evidence.[6]

### C.

■ Our final statutory obligation is to determine whether the death penalty is excessive or disproportionate to the penalty imposed in similar cases, taking into account the crime, the strength of the evidence, and the defendant. In doing so "[w]e must examine all capital murder convictions except those where the State waived the death penalty." *State v. Boliek*, 706 S.W.2d 847, 851 (Mo. banc 1986), *cert. denied* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986).

In following the mandate of [*Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980),] to establish "clear and objective standards" as to what types of murders constitute "depravity of mind," this Court, while not expressly adopting a precise formula, has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

*State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984), *cert. denied* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). These guidelines may also be used to assist us in our proportionality review of death sentences. *State v. Sidebottom*, 753 S.W.2d 915, 927 (Mo. banc 1988); *State v. Stokes*, 638 S.W.2d 715, 724 (Mo. banc 1982), *cert. denied* 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983).

Here, the evidence shows that Jason was the last member of the Sloan family to be shot. The jury could have reasonably believed that Jason had heard the previous gunshots and was therefore hiding under a blanket, his arms covering his head, in a hopeless effort to conceal himself from appellant's aim. This is sufficient evidence of psychological torture, as it indicates that Jason had the opportunity to anticipate and reflect upon his impending death while his parents and brother were shot. *See State v. Mathenia*, 702 S.W.2d 840, 845 (Mo. banc 1986), *cert. denied* 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986). The jury could also have found that the murder of Jason was without any substantive motive; appellant acknowledged that he felt no hostility towards his brother and shot him only because his mother had told him to do so. The evidence could support a conclusion that appellant's true motive in killing Jason was to perpetuate the planned cover up of the murder of Paul Sloan. Finally, appellant's unsuccessful attempt, both before and after the crime, to cover up his responsibility by casting blame on an innocent person indicates a lack of remorse.

However, the overriding factor in this case is the nature of the crime; Jason's killing was part of the cold-blooded mass murder of appellant's entire family. We have affirmed the death penalty in several other cases involving multiple homicides. *See State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988); *State v. Rodden*, 728 S.W.2d 212 (Mo. banc 1987); *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986), *cert. denied* 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed. 2d 574 (1986); *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985), *cert. denied* 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986); *State v. Gilmore*, 697 S.W.2d 172 (Mo.

---

6. We express no opinion as to the sufficiency of the evidence to support the depravity of mind aggravating circumstance. *See State v. Zeitvo-* gel, 707 S.W.2d 365, 369 (Mo. banc 1986), *cert. denied* 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986).

banc 1985), *cert. denied* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984), *cert. denied* 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).[7] Except for *Byrd*, all of the prior cases involved fewer than four homicides. A multiple murderer's "willingness to kill, and kill again, merits even greater societal concern than individual homicide and particularly warrants imposition of the ultimate punishment." *State v. Rodden*, 728 S.W.2d at 222. The societal concern is intensified where the victims of the multiple homicide comprise the murderer's *entire immediate family.*[8]

Another factor to consider is the strength of the evidence. Here, the evidence against appellant could not be stronger, given appellant's detailed confessions of the killing of Jason and the rest of the Sloan family. *See State v. Wilkins*, 736 S.W.2d 409, 417 (Mo. banc 1987).

We must also consider the defendant. An alarming number of capital murder cases involve young offenders. *See generally State v. Wilkins*, 736 S.W.2d 409, 418–23 (Donnelly, J., dissenting). While in many of these cases life sentences were imposed by the jury despite murderous acts arguably more physically gruesome than those involved here, none involved the mass murder of the defendant's entire family. We have affirmed the death penalty in cases where the defendant was 19 or younger at the time of the crime. *See id.,* 736 S.W.2d at 409 (sixteen); *State v. Pollard*, 735 S.W.2d 345 (Mo. banc 1987), *cert. denied* —— U.S. ——, 108 S.Ct. 733, 98

L.Ed.2d 682 (1988) (nineteen); *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984), *cert. denied* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984) (seventeen); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), *cert. denied* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984) (eighteen); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982), *cert. denied* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983) (eighteen).

Although there was evidence of past alcohol and drug abuse by appellant, appellant was not impaired at the time of the. crime. In addition, the jury clearly rejected appellant's claim of psychological impairment due to the influence of his mother, and we do not find that appellant was a "weakling and a follower." *State v. McIlvoy*, 629 S.W.2d 333, 341–42 (Mo. banc 1982).

A review of prior capital murder cases leads us to the conclusion that the sentence of death returned by the jury is not excessive or disproportionate to other cases in which the death penalty has been imposed.

Appellant's conviction of first degree murder for the killing of Jason Sloan and the imposition of the death sentence are affirmed.

BILLINGS, C.J., and WELLIVER, ROBERSTON, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

---

7. A case with facts similar to those found here, but where the death penalty was not imposed, is *State v. Baskerville*, 616 S.W.2d 839 (Mo.1981). The defendant, 19, had shot and killed two adult victims and then shot and killed one of the victims' seven-year-old son. The boy had hidden from defendant and pleaded for his life prior to being shot in the head. The jury recommended life sentences for the two adult victims but was unable to reach a decision as to the murder of the boy. The trial court then imposed a life sentence as required by § 565.006.2, RSMo 1978 (repealed). *Baskerville* is distinguishable; the victims were not members of the defendant's family, and the trial judge's report indicated there was some question as to whether the verdict foreclosed all doubt with respect to the defendant's guilt.

8. In the five reported capital murder cases in which the victim or victims were members of the defendant's immediate family, the State sought the death penalty in only one, *State v. Powell*, 728 S.W.2d 622 (Mo.App.1987). *See State v. Clevenger*, 733 S.W.2d 782 (Mo.App. 1987); *State v. Allen*, 714 S.W.2d 195 (Mo.App. 1986); *State v. Carr*, 687 S.W.2d 606 (Mo.App. 1985); *State v. Carter*, 674 S.W.2d 655 (Mo.App. 1984). In *Powell*, the defendant shot and killed his son. The State sought the death penalty, but the jury imposed a life sentence without parole. *Powell* is clearly distinguishable; there was evidence of provocation and prior altercations between the defendant and the victim.

**BLACKMAR, Judge, concurring.**

I believe that the trial judge trod close to the line in overruling the defendant's challenges for cause directed at venirepersons Blair, Davison and Jaynes. All three responded to defense counsel's interrogation in such a way that the use of peremptory challenges was virtually compelled when the jurors were not removed for cause. Defense counsel's questions were entirely clear and entirely proper. Counsel was not trying to secure an improper commitment, but rather was attempting to determine whether the jurors were irreversibly committed to a position adverse to his client. A mere question about whether a prospective juror could "follow the instructions of the court" would not yield the desired information.

After defense counsel concluded his questioning the prosecutor, apparently fearing the loss of promising jurors or wanting to limit the defense's discretion in exercising peremptories, sought to rehabilitate the three by leading questions, continuing until the jurors confirmed the answers he sought. I strongly suspect that the earlier answers gave better indication of their true sentiments, and that they obliged the prosecutor when they sensed the response he desired.

In *State v. Hopkins*, 687 S.W.2d 188 (Mo. banc 1985), we held that trial judges should freely excuse jurors whose responses gave substantial indication of bias. This suggestion is all the more appropriate in a death penalty case. I doubt very much that the trial judge, by looking at or listening to the jurors as they responded to the prosecutors' questions, could discern anything which would dispel the initial indication of a fixed position on the death penalty for deliberate homicide.

The point is all the more important in the light of the Court's opinion in *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988), which gives the jury in a case in which the death penalty is sought the unrestricted right to cop out at the penalty phase by announcing that it is unable to agree on the punishment, so that the trial judge must then make the decision as to life or death.

By virtue of this holding a single juror may keep this jury from deciding the punishment. Our trial judges have been rather free in sustaining challenges to jurors who indicate that they may not be able to consider the death sentence. *See State v. Jones*, 749 S.W.2d 356 (Mo. banc 1988). Yet defense counsel find it difficult to get challenges for cause sustained against jurors who indicate strong bias in favor of the death sentence.

Here, however, each juror gave a "bottom line" answer which indicated willingness to consider both death and life imprisonment. I wish that the trial judge had not presented us with the problem, but I cannot find legal error in his ruling.

I concur in the principal opinion.